ERNST STEEL CORPORATION, Respondent-Appellant, v HORN CONSTRUCTION DIVISION, HALLIBURTON COMPANY, et al., Appellants-Respondents. (Appeal No. 2.)

Fourth Department, November 7, 1984

**APPEARANCES OF COUNSEL**

*Corner, Finn, Nicholson & Charles* (*Michael Nicholson* of counsel), for appellants-respondents.

*Sacks, Montgomery, Pastore & Levine, P. C.* (*William J. Pastore* and *Edward J. Henderson* of counsel), for respondent-appellant.

## OPINION OF THE COURT

SCHNEPP, J.

This action arises out of a contract entered into between plaintiff, Ernst Steel Corporation, and defendants, Horn Construction Division, Halliburton Company, and Peter Kiewit Sons' Co. (Horn-Kiewit), for the fabrication and delivery by Ernst of approximately 1,670 tons of structural steel to be used by Horn-Kiewit to fulfill its prime contract with the City of New York Transit Authority (TA) for the construction of a portion of the Second Avenue subway. Horn-Kiewit appeals from an award to Ernst of damages in the amount of $194,874.50 based primarily on Horn-Kiewit's delay in the performance of the contract and Ernst cross-appeals from the award as inadequate.

This litigation centers on the delivery schedule: Ernst claiming an entitlement to damages for delay based on an alleged orally agreed-to July, 1974 delivery date and Horn-Kiewit contending that the written purchase order constituted the entire contract between the parties which was never breached. The record is clear that work on the subway project was suspended by the TA in early November, 1974 through no fault of any of the parties to this litigation, that actual delivery of the fabricated steel did not commence until October 18, 1975 and that neither party could have complied with a July, 1974 delivery date. Horn-Kiewit paid Ernst in full at the contract price for all steel delivered.

The following facts are not in dispute. The request for quotations for the work mailed by Horn-Kiewit in August, 1973 specified that delivery was required between June and December, 1974. However, the purchase order for the steel which Horn-Kiewit sent Ernst under date of October 19, 1973 contained the provision that "The above price [$622,910] is firm with delivery and payment schedules to be mutually agreed upon." Ernst refused to sign this purchase order until it received assurance that the TA had approved "shop connections welded", in place of the bolted connections required by the project specifications. Ernst typed this provision in the purchase order; however, it raised no question whatever about the omission from the purchase order of the alleged July, 1974 delivery date.

■ The trial court rejected Ernst's contention that the parties had mutually agreed that delivery of the fabricated steel would

begin during July, 1974 and found that the contract was modified to require delivery in November, 1974 and was breached by Horn-Kiewit on or about November 7, 1974 when work was suspended on the subway project. In our view the purchase order was not intended by the parties as a final expression of their agreement, since the delivery term was left open and the ability of the parties to establish a delivery schedule by a subsequent oral agreement was not limited (see Uniform Commercial Code, § 2-202). The court could have found from the testimony that Horn-Kiewit requested Ernst to commence fabricating in October, 1974 for delivery to the jobsite beginning in November, 1974 and that Horn-Kiewit was then aware of problems on the subway project which could delay performance. Ernst started fabrication of the steel in October, 1974 and continued until it completed the work in February, 1975. Although there is conflicting testimony, the court chose to credit Ernst's witnesses that although work on the subway project was suspended, it was never told to stop fabrication. The court's determination that Horn-Kiewit breached the contract in November, 1974 is supported by a fair interpretation of the evidence (*D'Angelo v Hastings Oldsmobile,* 89 AD2d 785, affd 59 NY2d 773).

Moreover, the court impliedly rejected, and in our view properly so, defendants' contention that a 1975 lease agreement completely extinguished Ernst's claim for delay and extended the time for performance of the contract. The prime contract and specifications provided that the TA would only pay for steel stored on property owned or leased by the City of New York. Ernst stored the steel that had been prepared for this subway job on its property pending notice to ship the steel to the jobsite. In February, 1975 when Ernst complained that the delay in delivering the steel was costing it added interest, Horn-Kiewit proposed that Ernst enter into a lease so that the TA could accept and pay for stored steel prior to delivery to the jobsite. Based on a sample document provided by Horn-Kiewit, Ernst prepared a lease dated February 21, 1975 providing that it would store the steel on a portion of its Buffalo property "for the period of time required for completion of erection of structural steel under [the subway] contract." In October, 1975 Ernst submitted a revised lease, also dated February 21, 1975, covering both its Buffalo and Titusville plants and providing merely for the storage of steel. Horn-Kiewit paid 85% of the contract price after the lease agreement was executed by Ernst and the balance when the steel was delivered. In our view, the lease agreement cannot be construed as a waiver of Ernst's claim for damages for delay. It was devised to permit Ernst to obtain at least partial payment

for the steel it was storing on its premises and did not relieve it of the obligation to deliver the steel to the jobsite. As we point out, *infra,* the lease modified the purchase order and limited Ernst's right to damages for the handling and storage of steel.

## DAMAGES

Ernst claimed and the trial court awarded damages for design changes induced by the TA in the amount of $12,025.50. The propriety of this award is not disputed on this appeal and the award is affirmed.

In addition, Ernst claims contract damages of $861,572.39 for the increased cost of Ernst's performance because of the delay[1] measured from July 1, 1974 as follows: interest expense on money borrowed to obtain operating capital ($473,561.38), increased delivery costs to the jobsite ($6,492.46), storage ($106,650.03), interplant transfers between Buffalo and Titusville ($47,259.50), extra handling ($62,552.03), loss of productivity due to congestion caused by the backup of steel ($136,469.02) and increased wage costs ($28,587.97). The trial court awarded delay damages totaling $182,849 including $66,545.01 for interest, $6,492.46 for increased delivery costs to the jobsite, $47,259.50 for interplant transfers and $62,552.03 for extra handling, and disallowed the remaining items of claimed damages.

Ernst included a percentage of its shop and home office overhead expenses and a 10% profit[2] in its claims for increased fabrication costs due to increased labor and trucking costs, extra handling and loss of productivity. Horn-Kiewit contests the computation of shop overhead as grossly excessive and void. In awarding Ernst the full amount of its claim for costs of extra handling and increased delivery, the court impliedly concluded that plaintiff's method of apportioning overhead was correct. Ernst submitted proof at the trial calculating its shop overhead to average 188% of its direct labor costs. This percentage was then multiplied by the amounts Ernst claimed for the above items of alleged damage to arrive at a figure for shop overhead for these claims. Horn-Kiewit argues that use of the formula is inappropriate since Ernst has not proven that Horn-Kiewit caused any increase in plaintiff's overhead expenses.

---

1. The first cause of action set forth in the complaint alleges that "failures, breaches, interferences, directives, acts and omissions of Horn-Kiewit" increased plaintiff's cost of performance.

2. On this appeal, Horn-Kiewit does not dispute the home office overhead expense and profit percentage claimed by Ernst.

■ In our view, Ernst's calculation of shop overhead was proper. Where it is clear that there has been a breach, damages will rarely be denied because the amount is uncertain (*Berley Inds. v City of New York*, 45 NY2d 683, 687; *Randall-Smith, Inc. v 43rd St. Estates Corp.*, 17 NY2d 99, 106; *Tobin v Union News Co.*, 18 AD2d 243, affd 13 NY2d 1155). However, there must be a reasonable basis for the determination so that the amount may be obtained with some exactness (*Tobin v Union News Co.*, 18 AD2d 243, 245, *supra*). It is clear from the testimony submitted by plaintiff's accountant that when labor costs increase, shop overhead necessarily increases and the formula which was used properly related Ernst's overheard expenses to the increases in its labor costs allegedly caused by the delay.

Considering next each specific item of claimed damage, we note that generally under section 2-710 of the Uniform Commercial Code, Ernst is entitled to recover "any commercially reasonable" expense incidental to Horn-Kiewit's breach, the purpose of the remedy being to put Ernst in as good a position as timely performance would have done (Uniform Commercial Code, § 1-106, subd [1]).

■ In order to be put in as good a position as if Horn-Kiewit had timely performed the contract, Ernst is entitled to recover increased delivery costs because of the delay of more than a year. Higher mileage and wage rates for truck deliveries along with an increase in diesel fuel costs from 1974 to 1976 are supported by the record. There is no need to disturb this award.

■ The trial court awarded Ernst the entire amount it claimed for "extra handling", and found that in order to continue fabricating the steel (after November 7, 1974) and making it ready for delivery, Ernst was required to move and handle the steel in the aisles and in and out of its plants, thereby incurring additional labor expenses. This extra handling was determined to be a "direct result of the failure to deliver and the necessity to store steel" on Ernst's premises. We agree in part.

The record shows that pending notice to deliver the steel to Horn-Kiewit the fabricated material was stored both indoors and outdoors in the Buffalo and Titusville plants. At times, Ernst had to move the steel and at trial Ernst submitted exhibits listing the daily amounts and monthly summaries of the extra handling costs for each plant until the steel was finally delivered to the jobsite. The trial court allowed Ernst its handling costs for the entire period. We disagree because the claim for extra handling was in part covered by the lease entered into on February 21, 1975. Under this lease, Ernst agreed in "consideration of one dollar (1.00)" to rent a portion of its property for

the "storage of structural steel". The lease did not provide for any additional compensation for handling incidental to storage. Nevertheless, the lease cut off Ernst's claim for extra handling as an incidental damage attributable to Horn-Kiewit's breach. As a result of the lease, extra handling costs as an item of damages for delay must be limited to those incurred between the date of the breach on November 7, 1974 and the commencement of the lease on February 21, 1975. By reference to Exhibits Nos. 75A and 75B in evidence and the addition of the overhead and profit margin, we calculate the amount of this damage at $50,545.11 and modify the judgment accordingly.[3]

█ We find that the trial court also erred in awarding Ernst interest costs. Ernst contends it was entitled to recover interest expenses incurred in financing working capital as an item of incidental damage, since it had borrowed money to perform the contract. Ernst claims that Horn-Kiewit's delay in accepting and paying for the steel prevented it from repaying this indebtedness and forced it to borrow more money to pay increased costs resulting from the delay. The court awarded Ernst the amount it claimed for interest expense for the period from November of 1974 through July of 1976, when the final delivery of steel was made. It apparently derived the sum awarded by totaling Ernst's expenditures on the Horn-Kiewit job for each month and multiplying this sum by the prime monthly interest rate Ernst was paying its bank. The expenditures considered by the court included the sums Ernst claimed as damages for loss of productivity and increased wages even though these items were disallowed. Horn-Kiewit contends that Ernst is not entitled to any

| 3. | | Walden | Titusville |
|---|---|---|---|
| | November, 1974 total | $ 2,842.35 | |
| | Less costs for November 1 — November 6 | 530.12 | |
| | Costs for November | 2,312.23 | 0 |
| | December, 1974 total | 1,607.04 | $3,694.27 |
| | January, 1975 total | 1,235.03 | 3,416.19 |
| | February, 1975 total | 477.76 | 2,383.88 |
| | Less costs for February 21 — February 28 | 25.62 | 238.28 |
| | Costs for February | 452.14 | $2,145.60 |
| | Total direct labor cost | 14,862.50 | |
| | Shop overhead at 188% | 27,941.50 | |
| | | 42,804.00 | |
| | Home office overhead at 7.35% | 3,146.10 | |
| | | 45,950.10 | |
| | Profit at 10% | 4,595.01 | |
| | Amount of claim | $50,545.11 | |

interest whatever because interest is a consequential damage not recoverable under the Uniform Commercial Code.

The proof shows that in 1974 Ernst had to borrow money in part to obtain operating capital and also to meet other obligations. The record reflects that one reason for Ernst's borrowing was its commitment to purchase outstanding shares of its stock from several of its stockholders. During this time, moreover, Ernst incurred additional expenses when it reestablished the operation of its warehousing business. There is no question that Ernst borrowed against its established line of credit to finance its general plant operations, including the Horn-Kiewit contract. There is no proof, however, that Ernst borrowed funds specifically to perform this contract nor is there evidence of the over-all percentage of its operations which were dependent on borrowing or the percentage of its borrowing which was related to this contract. In fact, it can be inferred from Ernst's proof that after the quarter ending July 31, 1974 Ernst did not need to borrow to finance its plant operations, and reduced some of its indebtedness with revenues derived from its business operations. Moreover, we can only speculate whether money borrowed by Ernst was spent on the Horn-Kiewit contract since its records do not differentiate between business receipts and borrowed funds. The trial court's implicit assumption that 100% of the Horn-Kiewit contract was dependent on bank financing is not supported by the record.

In an appropriate case a seller is entitled to recover commercially reasonable finance and interest charges incurred as a result of a buyer's breach as a proper item of incidental damages (see Uniform Commercial Code, § 2-710; *Neri v Retail Mar. Corp.,* 30 NY2d 393). For the most part, however, interest expenses have only been awarded to sellers for indebtedness specifically identified to goods intended for resale to the breaching party and who, as a result of the breach, cannot repay the loans (see, e.g., *Bulk Oil v Sun Oil Trading Co.,* 697 F2d 481; *Intermeat, Inc. v American Poultry,* 575 F2d 1017; *Neri v Retail Mar. Corp., supra; Hofmann v Stoller,* 320 NW2d 786, 792 [ND]; *Gray v West,* 608 SW2d 771, 781 [Tex]). In the case of *Atlas Concrete Pipe v Au & Son* (467 F Supp 830, revd 668 F2d 905)[4] relied upon by the trial court, interest expenses were awarded. Although in that case there was no proof of a loan specifically covering the contract goods, the seller proved instead that it was

---

4. The United States Court of Appeals for the Sixth Circuit reversed the award of summary judgment in favor of the seller, Atlas Concrete Pipe, Inc., and remanded the case for a plenary trial on liability and damages. The Appeals Court did not reach the damages issues (668 F2d 905, 910, *supra*).

virtually insolvent and had financed fully 100% of its operations. While there is no requirement in the code that interest expenses must be identified to indebtedness specifically covering the contract goods, where a seller cannot link the claimed damages to the contract it clearly has a more difficult burden of proof. In our view, Ernst has not substantiated its claim that the entire amount of increased costs due to the delay was paid for with borrowed funds (cf. *Atlas Concrete Pipe v Au & Son, supra*) and it has failed to link any portion of its indebtedness to the delay in payment resulting from Horn-Kiewit's breach. Ernst has not met its burden of proof that its claim for financing costs was attributable to Horn-Kiewit's breach, and the award of interest expenses must be reversed due to a failure of proof.

■ Further, we disagree with the award of damages for interplant transportation. Ernst contends that when Horn-Kiewit requested it to commence fabricating in October, 1974, it determined to split the fabrication between its Buffalo, New York, and Titusville, Pennsylvania, plants, although originally it had intended to perform all the work in Buffalo. This required the shipment of steel from Buffalo to Titusville. In October, 1974, Ernst started fabrication in both its plants which it continued until the fabrication job was completed in February, 1975. The record is devoid of any proof of a modification of the contract requiring Horn-Kiewit to pay additional costs for the fabrication work performed in Titusville. Testimony submitted in behalf of Ernst that Horn-Kiewit promised to "work something out" when advised that fabrication was to be completed at both plants was denied. Even if we were to hold that the testimony was credible, the promise was indefinite and insufficient to support a conclusion that there was a meeting of the minds which is essential to the formation of a binding contract. "Under the Uniform Commercial Code, if the parties have intended to contract, and if an appropriate remedy may be fashioned, a contract for sale does not fail for indefiniteness if terms, even important terms, are left open (§ 2-204, subd [3]) * * * But, of equal importance, if there be no basic agreement, the code will not imply one." (*Kleinschmidt Div. of SCM Corp. v Futuronics Corp.*, 41 NY2d 972, 973.)

■ We agree with the court, however, that Ernst was not entitled to damages for increased wages, loss of productivity or storage. Ernst claims damages for increased wages based on its contention that the contract was to be performed prior to the expiration in June, 1974 of the labor agreements covering its fabrication labor at the Buffalo plant. However, the proof shows that, regardless of delays attributable to Horn-Kiewit and the

TA, Ernst was not prepared to fabricate until October, 1974 due to its failure to comply with the provision of the contract requiring inspection of the steel by the TA prior to fabrication. Moreover, the purchase order even as modified only required delivery to commence in November, 1974. Since the expiration of Ernst's labor agreements occurred prior to the breach, the claim was properly denied. In any event, the Titusville labor costs were less than labor costs at Buffalo which indicates, as found by the trial court, that a reduction rather than an escalation of labor costs resulted.

We also agree with the trial court that there was a failure of proof on the claim for loss of productivity. Ernst simply failed to show that the accumulation of fabricated steel caused by Horn-Kiewit's failure timely to accept delivery resulted in any plant congestion affecting productivity.

■ Finally, the trial court properly rejected Ernst's claim for storage costs because no damage was proved. Ernst claims costs based on the customary charge to third parties who stored steel on its premises. However, there was no proof Ernst lost warehousing business because it had to store defendants' steel, nor was there any evidence Ernst expended any money to store the steel except for handling, which costs it claimed, and was awarded, as a separate item of damages. Moreover, the claim for storage must necessarily cover two distinct periods. Ernst's claim for storage costs after February 21, 1975 was extinguished by the lease which provided for rent of $1, receipt of which was acknowledged by Ernst. As to the period from November 7, 1974 to February 21, 1975, under section 2-710 of the Uniform Commercial Code storage cost is a proper item of incidental damages (see Neri v Retail Mar. Corp., 30 NY2d 393, supra). However, section 2-710 is limited to "commercially reasonable charges, expenses or commissions incurred" (emphasis supplied). The Comment to section 2-710 explains further that the purpose of the remedy is "[t]o authorize reimbursement" for all commercially reasonable "expenditures". Since the purpose of the remedy is only to put the seller in as good a position as performance would have done (Uniform Commercial Code, § 1-106, subd [1]) incidental damages under the code are limited to out-of-pocket expenses.

Accordingly, the judgment should be modified to award damages on the first, second, fifth and eighth causes of action totaling $69,063.07, together with interest on such amount from August 1, 1976, as follows: $12,025.50 for design changes;

$6,492.46 for increased delivery costs to the jobsite and $50,545.11 for extra handling and as modified, affirmed.

HANCOCK, JR., J. P., DENMAN, GREEN and O'DONNELL, JJ., concur.

Judgment unanimously modified on the law and facts, and as modified, affirmed without costs, in accordance with opinion by Schnepp, J.