**COMMONWEALTH EDISON COMPANY, Plaintiff,**

v.

**ALLIED–GENERAL NUCLEAR SERVICES, et al., Defendants.**

**No. 79 C 2866.**

United States District Court, N.D. Illinois, E.D.

Feb. 14, 1990.

As Amended March 6, 1990.

Sidley & Austin, Henry L. Mason III, William F. Conlon, Maripat Flood, Pamela R. Hanebutt, Robert J. Burson, Gloria Mitka and Mark Blocker, Chicago, Ill., for plaintiff.

Wildman, Harrold, Allen & Dixon, Max E. Wildman, H. Roderic Heard, John E. Frey, Brian W. Lewis, R. John Street and David M. Simon, Chicago, Ill., for defendants.

## OPINION AND ORDER

POSNER, Circuit Judge (sitting by designation).

Ten years ago, Commonwealth Edison filed this suit for breach of contract against Allied–General Nuclear Services (AGNS), a partnership of companies, and against the partners themselves. A diversity suit governed (pursuant to the choice of law provision in the contract) by New York law, it had bounced from judge to judge over the years until it fell into my lap when I volunteered to assist the Northern District of Illinois in clearing its growing backlog of civil jury cases. On October 19, 1989, I issued an order resolving a number of open questions. Before me now are a number of other motions, three of which— motions for partial summary judgment— are both fundamental in defining the scope of the trial (which will begin on March 19, 1990) and of sufficient general interest to warrant a published opinion.

The complexity of the issues and the importance of this decision to the scope of the lawsuit persuaded me that it would be prudent to solicit the parties' views before making the decision final, so on January 30 I issued a proposed opinion and directed the parties to submit by February 9 briefs setting forth any disagreements they might have with the findings and conclusions in it. I stated that any objection not made in the briefs would be deemed waived. The briefs have been submitted and the matter is now ripe for decision. It should go without saying that this opinion supersedes the proposed one, from which it differs, indeed, in important respects.

A complex, high-stakes case between two large law firms often develops a life of its own. That has happened here. In their relentless pursuit of the "facts," the parties have lost sight of the central legal issues. I am convinced that there is only one, minor, triable issue of liability; the trial will be confined for the most part to limited issues of damages.

Some background will be necessary to make these conclusions understandable. Commonwealth Edison owns and operates nuclear power plants. In these plants, fuel manufactured from uranium undergoes fission, producing heat that makes steam to drive turbines that generate electricity. Eventually the fuel becomes depleted of fissionable material and must be discharged from the reactor and replaced by new fuel. The spent fuel contains, however, some uranium, which can be extracted and used to manufacture new fuel. The beauty of reprocessing spent nuclear fuel is that it not only reclaims what would otherwise be a waste product but also helps solve the vexing problem of how to dispose of spent nuclear fuel safely. The spent fuel is highly radioactive and no one has come up with a method for permanently storing it that is proof against contamination of the soil or water in which it is stored. As a result, most such fuel remains on site at the nuclear power plant, stored in pools of water to await the ever-receding day when a permanent home for it will be found, and taking up more and more room as the operation of the plant throws off a growing accumulation of spent fuel.

All is not rosy, however, with the idea of reprocessing nuclear fuel. Reprocessing produces plutonium as a byproduct, and plutonium is the key component of nuclear weapons. Some people fear that widespread commercial reprocessing would promote nuclear proliferation and in particular make it easier for terrorists to obtain the components for assembling nuclear weapons. *Westinghouse Electric Corp. v. United States*, 598 F.2d 759, 762 n. 4 (3d Cir.1979).

In 1971 Edison issued a request for bids to supply it with reprocessing services for spent nuclear fuel. AGNS, a partnership formed to build a large commercial nuclear reprocessing plant in Barnwell, South Carolina, responded to the request. In 1974—at the height of interest in nuclear power following the run-up in oil prices after the Arab–Israeli war in October 1973, and against a background of governmental efforts to encourage reprocessing, *Allied–General Nuclear Services, Inc. v. United States*, 12 Cl.Ct. 372, 388–90 (1987), aff'd in part, rev'd in part, 839 F.2d 1572 (Fed.Cir. 1988)—the parties signed the contract that is the subject of this suit. The contract requires AGNS to reprocess at Edison's request any spent fuel discharged by designated nuclear power plants of Edison through 1979 and to deliver the reprocessed fuel to Edison.

A potential hitch evident to the parties at the time of the negotiations was that although the Nuclear Regulatory Commission had issued a construction permit for the Barnwell plant, and the plant was fairly close to completion, the Commission had not yet issued an operating license and until AGNS had that it could not lawfully reprocess nuclear fuel. Edison was concerned that AGNS might drag its feet in obtaining a license until it had signed up enough other electrical utilities to be able to operate Barnwell at full capacity. Section 16 of the contract, the Facility Contingency Plan, was intended to respond to this concern. Section 16.1(a) provides that "subject to paragraph (b) below, this Agreement shall be construed as [AGNS's] unequivocal commitment to (1) be ready to process fuel or (2) to have such fuel processed by others by not earlier than one hundred twenty (120) days after any discharge [i.e., removal of spent fuel from the reactor core] and by not later than (i) twelve (12) months after the discharge hereunder or (ii) December, 1975, whichever is later." Paragraph (b) provides, so far as relevant here, that if Edison makes its demand under (a) "on or before a date which, except for reasons of force majeure (provided, however, with regard to commencement of commercial operation, fail-

ure to obtain an operating license shall not be deemed a force majeure reason), is prior to the commencement of commercial operation of [the Barnwell] Plant," then AGNS shall be required to deliver "fissile material equivalent to that which would have been recovered from the fuel" discharged by Edison if Barnwell had reprocessed it. In other words, if the plant was not in operation when AGNS was required by paragraph (a) to accept Edison's spent fuel for reprocessing, AGNS would have to provide equivalent fuel unless the plant was not in operation for force majeure reasons *other than* AGNS's "failure to obtain an operating license" for the Barnwell plant. A mere failure to obtain an operating license would not excuse AGNS's failure to perform even if AGNS had sought a license diligently. But it is equally important to note, in view of Edison's reiterated observation that nothing ever occurred to make the supplying of equivalent fissile material impossible, that when and if AGNS was prevented by causes that do count as force majeure from placing Barnwell into commercial operation, it was excused from supplying equivalent fissile material whether or not it would have been possible or practicable to supply it.

The operating license has never been issued. In 1975 the Nuclear Regulatory Commission delayed the issuance of any operating licenses for nuclear fuel reprocessing plants pending hearings to determine the environmental impact of such reprocessing. *Mixed Oxide Fuel*, 40 Fed. Reg. 53056, corrected, 40 Fed.Reg. 59497 (1975). The Commission decided in the same order to grant interim operating licenses, 40 Fed.Reg. at 53061, but this decision was reversed in *National Resources Defense Council, Inc. v. NRC*, 539 F.2d 824 (2d Cir.1976). The Second Circuit's decision was itself vacated and remanded to determine mootness, *Allied–General Nuclear Services v. National Resources Defense Council, Inc.*, 434 U.S. 1030, 98 S.Ct. 759, 54 L.Ed.2d 777 (1978) (per curiam), but by then it was too late for interim licensing. For in April 1977, with interim licensing suspended by virtue of the Second Cir-

cuit's as yet unvacated decision and the environmental-impact proceeding not yet complete, President Carter had declared an indefinite moratorium on commercial reprocessing, 13 Weekly Comp.Pres.Doc. 502, 503 (1977); and although this declaration had no legal force, the Nuclear Regulatory Commission was impressed and the next week adjourned the environmental hearings until further notice. *Mixed Oxide Fuel*, 42 Fed.Reg. 22964 (1977). On December 23, 1977, the Commission followed up with an order terminating the environmental proceeding and all pending licensing proceedings (expressly including AGNS's application for an operating license for Barnwell), but stating that it would reexamine these matters after completion of two pending studies of the safety of nuclear reprocessing; completion was thought to be two years away. *Mixed Oxide Fuel*, 42 Fed.Reg. 65334 (1977). It was this order that caused the Supreme Court to remand the *National Resources Defense Council* case for a determination of whether the case had become moot.

On October 8, 1981 President Reagan announced that he was "lifting the indefinite ban which previous administrations placed on commercial reprocessing activities in the United States." *Statement Announcing a Series of Policy Initiatives on Nuclear Energy*, 1981 Public Papers of the President 903, 904, quoted in *Allied–General Nuclear Services v. United States*, 839 F.2d 1572, 1574 (Fed.Cir.1988). Presumably he was referring to the policies of the Carter Administration, for insofar as the "ban" was due to orders by the Nuclear Regulatory Commission and the courts the President could not lift it by a proclamation. By this time the studies had been completed (1980), and the Commission, notwithstanding the Carter Administration's continued support for the moratorium on commercial reprocessing, had on August 13, 1980, issued an order soliciting comments on whether to reopen the environmental proceeding. 45 Fed.Reg. 53933. But the Commission had not yet either reopened it or any of the licensing proceedings; indeed, two days later the Department of Energy noted that "reprocessing

has been indefinitely deferred." *Compliance With the National Environmental Policy Act*, 45 Fed.Reg. 54399, 54399–01. Nor did President Reagan's statement result in the reopening of either type of proceeding. The fall in oil prices that began in 1981, and growing hopes (later dashed) that a solution to the problem of long-term storage of nuclear wastes was imminent, had removed any sense of urgency about commercial reprocessing either as an additional source of energy or as a solution to the storage problem. In addition, and perhaps critically, AGNS itself had lost interest in commercial reprocessing and was trying to sell Barnwell to the Department of Energy, possibly for storage of nuclear fuel. See *id.* There is evidence that AGNS's loss of interest in commercial reprocessing was *the* reason that the hearings were not reopened in the wake of President Reagan's statement, though this is not important. As late as 1985, the Commission reaffirmed its 1977 order suspending the environmental proceeding. *Revocation of Policy Statements*, 50 Fed.Reg. 45597, 45597–03 (1985). No facility for the commercial reprocessing of spent nuclear fuel has been licensed since the initial moratorium went into effect back in 1975, and there are no prospects for such licensing, because no one is interested in the reprocessing business any more.

Edison made repeated demands of AGNS to accept spent fuel and to provide reprocessed or equivalent fissile material. AGNS refused, precipitating this suit, which after being carved down by my previous orders seeks damages for the net value of the performance of the contract: essentially, for the costs that Edison incurred in storing spent fuel that (it contends) AGNS was required to take under the contract, and for the difference between the contract price of equivalent fissile material and the price Edison had to pay to buy the same amount of nuclear fuel on the open market.

With this as undisputed (or indisputable) background, I turn to the three motions for partial summary judgment.

1. AGNS wants me to rule that the moratorium on commercial reprocessing that (it contends) the Nuclear Regulatory Commission first imposed in April 1977 in the wake of President Carter's démarche and then confirmed in December of that year was a force majeure event that discharged AGNS's duty to perform under the Facility Contingency Plan (that is, under section 16 of the contract). Edison responds that the Commission's orders merely prevented AGNS from obtaining an operating license and are therefore within the parenthetical exception to the force majeure clause in section 16.1(b) ("failure to obtain an operating license shall not be deemed a force majeure reason"). Edison considers the reason that AGNS failed to obtain an operating license "entirely irrelevant."

The interpretation of contractual language is a task for judge, not jury, and therefore meet for summary judgment, provided that the language is sufficiently clear to allow confident interpretation without recourse to "extrinsic" evidence, for example, testimony by the persons who negotiated the contract. This is the "four corners" rule, a rule of substantive law for purposes of determining whether in a diversity case state or federal law supplies the rule of decision. There is a trend away from the four corners rule toward an approach in which extrinsic evidence may be used not only to disambiguate a contract that appears ambiguous but also to show that apparently unambiguous language is ambiguous when the context in which the contract was negotiated is understood. *Agfa–Gevaert, A.G. v. A.B. Dick Co.*, 879 F.2d 1518, 1521–22 (7th Cir.1989). New York has, as noted in *Agfa–Gevaert*, resisted the trend. *Id.* at 1522; *West, Weir & Bartel, Inc. v. Mary Carter Paint Co.*, 25 N.Y.2d 535, 540, 307 N.Y.S.2d 449, 552–53, 255 N.E.2d 709, 711–12 (1969); *Wells v. Shearson Lehman/American Express, Inc.*, 72 N.Y.2d 11, 19, 530 N.Y.S.2d 517, 522, 526 N.E.2d 8, 12 (1988). But whether the old approach or the new is followed, the result is the same, because the circumstances in which the contract was negotiated and signed support rather than contra-

dict the inference that would be drawn from the text by someone ignorant of the background.

Two sections of the contract are critical, sections 16.1 and 17.1. Section 16.1 has already been introduced; I turn to section 17.1.

Ordinarily when performance of a contract would be illegal because of a statute, regulation, or other official action that has occurred since the contract was signed, the promisor is discharged without liability, pursuant to the common law doctrine of impossibility (today often called "impracticability"). *407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 296 N.Y.S.2d 338, 244 N.E.2d 37 (1968); Restatement of Contracts (Second), § 264 (1981). If, however, the parties include a force majeure clause in the contract, the clause supersedes the doctrine. *Northern Indiana Public Service Co. v. Carbon County Coal Corp.*, 799 F.2d 265, 276 (7th Cir.1986); *Wiggins v. Warrior River Coal Co.*, 696 F.2d 1356, 1359 (11th Cir.1983). For, like most contract doctrines, the doctrine of impossibility is an "off-the-rack" provision that governs only if the parties have not drafted a specific assignment of the risk otherwise assigned by the provision.

Section 17.1 of the contract between Edison and AGNS is an elaborate force majeure clause that specifies, among other circumstances excusing either party, "compliance with any order, judgment, action (which for the purposes hereof shall include inaction or failure to act), direction of any court, Governmental officer, department, agency, authority or committee thereof, [or] failure to obtain or maintain a required permit, license, authorization or permission despite ... [the party's] due diligence to obtain same." While merely reciting "force majeure" in a contract, or including in the contract a standard, boilerplate, catch-all force majeure provision, invokes a body of common law doctrine interpreting the term that is largely indistinguishable from the doctrine of impossibility (or impracticability), *Kel Kim Corp. v. Central Markets, Inc.*, 70 N.Y.2d 900, 524

N.Y.S.2d 384, 519 N.E.2d 295 (1987) (per curiam); *Nissho–Iwai Co. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530, 1540 (9th Cir.1984); cf. *Gulf Oil Corp. v. FPC*, 563 F.2d 588, 602 (3d Cir.1977); *International Minerals & Chem. Corp. v. Llano, Inc.*, 770 F.2d 879, 886 (10th Cir.1985), the parties took neither course here. Instead they spelled out the circumstances that would constitute a defense to AGNS's duty to perform, dealing with the question of regulatory force majeure with considerable specificity and in two separate sections of the contract. So it is the contract, rather than a body of judicial doctrine, that I must interpret.

If section 17.1 stood alone, the issue on summary judgment would be whether it is plain beyond peradventure that, for reasons beyond AGNS's control, AGNS could not have obtained an operating license for Barnwell before its obligations under the contract expired. The answer may seem to be plainly "yes" in light of the series of orders by the Nuclear Regulatory Commission recited earlier in the opinion. Even if AGNS could have gotten an interim license in 1975, its interim license would have been wiped out the following year by the Second Circuit's decision in the *National Resources Defense Council* case, which held that such licenses were unlawful. Nothing AGNS could have done after that decision would have restarted the licensing process until August 13, 1980, when the Commission requested comments on resuming the licensing proceedings.

It is true that the moratorium on licensing contained an exception for fuel-storage licenses and that AGNS made no effort to obtain such a license. These facts would be material if the contract had been one for storage. It was not. AGNS made no promise to store Edison's nuclear fuel. It promised to reprocess it or, failing to obtain an operating license for its reprocessing plant in circumstances that did *not* constitute force majeure, to supply equivalent fissile material in lieu of reprocessed fuel. It further promised, in the latter event (that is, activation of the Facility Contingency Plan), to take title to the spent nuclear fuel that Edison tendered for re-

processing. This provision gave AGNS an added incentive to comply with its obligations under the contract, by making the storage of the spent fuel tendered to it under the contract a problem for it rather than for Edison; but the provision did not convert the contract into a contract for storage. The reference to "commercial operation" in the parenthetical in section 16.-1(b) is to reprocessing. Barnwell is a reprocessing facility. It has limited storage facilities, true, but only because it has to have a place to store fuel that is to be reprocessed, not because it is in the storage business. Storage is pertinent to the damages issues in the case, since if (but only if) AGNS broke its promise to take title to Edison's spent nuclear fuel, one consequence was to impose on AGNS the cost of storing fuel that otherwise Edison would have shipped to AGNS. The contract entitled Edison to treat any spent nuclear fuel that AGNS wrongfully refused to accept as AGNS's fuel, to be stored by Edison at AGNS's expense. (The analogy is to charging the owner of impounded cattle the cost of feeding them.) But AGNS's contractual obligations were suspended when and if commercial operation of Barnwell as a reprocessing facility, not as a storage facility, was prevented by circumstances constituting force majeure within the meaning of the contract.

AGNS made no comments in response to the Commission's invitation of August 13, 1980. By then it had lost all interest in commercial reprocessing. What is more, its lack of interest may have been what decided the Commission not to resume the licensing proceedings, for Barnwell was the flagship facility of the commercial reprocessing industry. Suppose that if AGNS had displayed interest, the licensing process could have been restarted, beginning in 1980. Was this too late to make a difference in this case? Surely yes, argues AGNS, pointing out that the contract obligated AGNS to take only the spent fuel that Edison discharged by the end of 1979. It could not have taken any spent fuel by the end of 1979, no matter how much dil-

igence it had exhibited before the Second Circuit wiped out interim licensing in 1976.

But it is essential to distinguish between the date of Edison's discharge of nuclear fuel and the date of AGNS's taking. The contract does not obligate AGNS to take any spent fuel *discharged* after 1979—that is true—but it specifies no date after which AGNS is free to refuse to *take* spent fuel discharged before 1979 ended. The contract contains no expiration date—no date on which AGNS's obligation to take spent fuel discharged before 1980 expires. Partly because spent fuel has to cool before it can be transported, the contract gives AGNS up to eighteen months after discharge in which to take possession of it. So maybe if AGNS had acted with all due diligence *before* 1976 and *after* 1979, it could have obtained an operating license in time to take spent fuel that Edison had discharged. I shall return to this question.

Thus far I have treated the contract as if section 17.1 stood alone. It does not. It begins "except as otherwise herein provided," and section 16.1 provides otherwise with regard to AGNS's failure to obtain an operating license. Section 16.1 cannot, however, rationally be interpreted, as Edison argues, to carve out from the force majeure clause *everything* that might prevent AGNS from obtaining an operating license, so that a failure to obtain such a license could not be force majeure no matter what the reasons for the failure. Remember that section 16.1(b) excuses AGNS from performance if there is force majeure *unless* the force majeure consists in a failure to obtain an operating license. "Unless" implies that there must be circumstances constituting force majeure that are not comprehended within the phrase "failure to obtain an operating license." Suppose a flood had severely damaged the Barnwell plant in 1977 and as a result the Commission would not issue an operating license. Section 17.1 explicitly names "flood" among the circumstances constituting force majeure. Is it possible that section 16.1, despite referring to force majeure as a reason for excusing AGNS from having to perform under that section, meant to exclude floods? Surely not, for this would make nonsense of the reference in the section to force majeure.

Or would it? There might seem to be some room for force majeure under Edison's suggested interpretation because if the flood disabled Barnwell after the operating license was issued the parenthetical exception to force majeure would be inoperative by its own terms. But the appearance is misleading. Section 16.1 is operative only *before* Barnwell begins commercial operation, that is, before it obtains an operating license. (Section 16.2 deals with force majeure events occurring after Barnwell obtained an operating license. That provision of course has never come into effect.) Edison has read force majeure out of section 16.1 except for an excruciatingly narrow exception for the interval between the grant of an operating license and the actual commencement of commercial operation.

■ This is not a plausible interpretation, and the testimony of Edison's negotiators concerning their belief as to what the contract meant cannot create a triable issue. *Porter v. Commercial Casualty Ins. Co.*, 292 N.Y. 176, 183–84, 54 N.E.2d 353, 356 (1944); *Hotchkiss v. National City Bank*, 200 F. 287, 293 (S.D.N.Y.1911) (L. Hand, J.), aff'd, 201 F. 664 (2d Cir.1912), aff'd, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913); *Energy Oils, Inc. v. Montana Power Co.*, 626 F.2d 731, 737 n. 11 (9th Cir. 1980); *L.S.S. Leasing Corp. v. United States*, 695 F.2d 1359, 1364 (11th Cir.1982); *Connecticut General Life Ins. Co. v. Chicago Title & Trust Co.*, 714 F.2d 48, 50 (7th Cir.1983). (Otherwise there could never be summary judgment in a contract case.) The undisputed background to the parenthetical exception in section 16.1(b) is that during the negotiations Edison expressed concern that AGNS might delay the licensing process while collecting enough contracts to assure that when Barnwell came on line it would be operating at full capacity. A provision already agreed to—section 17.1 in the final contract—conditioned any invocation of force majeure where the force preventing performance was the absence of an operating license on AGNS's

due diligence. But Edison was worried that the licensing process was so complicated that a want of due diligence could never be proved. This worry led it to request the parenthetical. The parenthetical eliminates mere failure to obtain an operating license from the force majeure clause and thereby assigns the risk of inexplicable delays in the licensing process to AGNS. But it does not assign to AGNS the risk of a moratorium on all commercial reprocessing so protracted as to amount, in practice though not in form, *Westinghouse Electric Corp. v. United States, supra,* 598 F.2d at 774, to an outright ban—though whether the series of orders by the NRC can be so characterized remains to be seen. Edison argues that it negotiated for "provisions assuring performance if for any reason reprocessing was unable to proceed," because other firms were seeking reprocessing licenses and Edison might have turned to them if AGNS pooped out. The contract is not so broadly drafted as Edison's paraphrase. More important, according to Edison's own submission the risk shifted to AGNS was the risk of AGNS's not getting a license as fast as its competitors, which is quite different from the risk of a governmental ban on reprocessing that would affect the other firms just as much as AGNS, and thereby place Edison at no disadvantage vis-à-vis firms that might have reprocessing contracts with AGNS's competitors.

The parties realized when the contract was signed that there was some risk that the government would not allow commercial reprocessing to go forward; reprocessing was controversial among environmental groups, as well as, of course, among opponents of nuclear power. But the contemplation of a risk does not show which party assumed it. *West Los Angeles Institute v. Mayer,* 366 F.2d 220, 225 (9th Cir.1966); Restatement (Second) of Contracts, *supra,* § 261, comment b; cf. *City of New York v. Local 333,* 79 A.D.2d 410, 411, 437 N.Y. S.2d 98, 99 (1981), affirmed without opinion, 55 N.Y.2d 898, 449 N.Y.S.2d 29, 433 N.E.2d 1277 (1982). While it is conceivable that a company in AGNS's position might be either so confident about a favorable outcome to the licensing process, or so

reckless, as to assume a virtually unlimited liability for the cost of storing years' worth of Edison's spent nuclear fuel for the indefinite future, I cannot find so improbable an assignment of risk anywhere in the contract. Edison's own argument for why it insisted on the parenthetical indicates that the purpose was to place on AGNS the risk that AGNS would fail to obtain a reprocessing license *while its competitors succeeded,* not the risk that no one would get a license. The parenthetical can only be read to except from the force majeure clause the failure to obtain a license in the context of a governmental program of processing license applications. If the program shut down, the parenthetical no longer applied. No rational jury could find the contrary.

■ Section 16.1 may seem, therefore, a red herring, irrelevant to the force majeure defense. But it is not; it has a vital significance. It makes clear that, *before* an event constituting force majeure within the meaning of section 17.1 occurred, AGNS's failure to obtain an operating license was not a defense to its contractual obligation either to reprocess Edison's spent fuel or to supply Edison with nuclear fuel from some other source. So I must consider whether there is a contestable issue as to when the first event constituting force majeure occurred. It was not when the Nuclear Regulatory Commission suspended the licensing proceedings in 1975 to await the outcome of the environmental proceeding. That was normal regulatory delay, because it had always been understood that the environmental and safety studies would have to be completed before operating licenses were issued—the process just had not been expected to take so long that the licensing proceedings would have to be suspended. It was not when the Second Circuit squashed the Commission's effort to carve out an exception to the suspension; the exception had been a footnote to the Commission's suspension order. It was not when the Commission in April 1977 declared that it was adjourning the environmental proceeding temporarily to absorb President Carter's bombshell. This was normal regulatory delay, too. Delays are

endemic to the regulatory process, and the parties must have known that a proceeding to license a novel method of production in the scary and delay-prone nuclear power industry would encounter delays of one sort or another as it wended its way to completion. AGNS argues that "public opposition" to licensing Barnwell was a force majeure event, but offers no particulars that would make the argument even remotely plausible (the term appears in a laundry list of force majeure events, sandwiched in between "civil disturbance" and "sabotage" and presumably deriving meaning from these neighbors)—and anyway waived it long ago.

On December 23, 1977, however, when the Commission terminated the environmental hearings—a precondition to licensing—and at the same time terminated the licensing proceedings as well, expressly including the proceeding for the licensing of Barnwell, normal procedural delay may well have turned into a substantive moratorium constituting regulatory force majeure within the meaning of the contract. I shall examine that question in a moment. For the present I hold only that no earlier event constituted force majeure. I hold this as a matter of law. But even assuming that the question of what constitutes regulatory force majeure is a question of fact (as I doubt), I believe that no reasonable jury could find an earlier event to have been force majeure.

It follows that AGNS has no force majeure defense for its refusal prior to December 23, 1977, to take spent nuclear fuel discharged by Edison. Does it have a force majeure defense for its subsequent refusals? Prima facie, the order of December 23 *was* regulatory force majeure. It shut down the licensing proceeding. It fits the language of section 17.1 dealing with compliance with government orders to a t, and it is not within the exception for mere failure to obtain an operating license in section 16.1.

■ But Edison offers three responses. First is that AGNS was obligated to use due diligence to obtain an operating license after the Nuclear Regulatory Commission on August 7, 1980, expressed a willingness to consider reopening the licensing proceeding. The argument is misleading in the form stated. The requirement of due diligence does not qualify the force majeure clause as a whole, but only the clause making failure to obtain an operating license a force majeure event; and a force can be majeure even though its immediate consequence is to prevent the obtaining of an operating license. Edison was concerned with AGNS's dragging its heels in the licensing proceeding, not with its failing to exert pressure on the Commission, the courts, the President, and Congress against all orders, judgments, decrees, laws, and regulations that might inhibit the reprocessing industry. However, apart from any specifically negotiated duty of due diligence, there is a general requirement, related to the duty of good faith that is read into all express contracts unless waived, that the promisor make a bona fide effort to dissolve the restraint that is preventing him from carrying out his promise. *Dezsofi v. Jacoby,* 178 Misc. 851, 853, 36 N.Y. S.2d 672, 674 (S.Ct.1942); cf. *Kiyoichi Fujikawa v. Sunrise Soda Water Works Co.,* 158 F.2d 490, 492–93 (9th Cir.1946). Far from being waived, this duty was explicitly imposed on AGNS by section 17.1(a) of the contract, which provides that "in the event of any such [force majeure] contingency, the party affected shall use its best efforts to remedy the cause in the shortest practicable time," labor disputes excepted. This brings in due diligence by the back door.

The cases hold that there must be a causal relationship between the want of diligence and the failure to remove the force majeure condition, or in this case to obtain an operating license notwithstanding the regulatory moratorium. Specifically, the want of diligence must be a necessary condition—a but-for cause—of the impossibility to perform. *Fratelli Pantanella, S.A. v. International Commercial Corp.,* 89 N.Y.S.2d 736, 739–40 (S.Ct.1949); *Model Vending, Inc. v. Stanisci,* 74 N.J.Super. 12, 180 A.2d 393 (1962); *Gulf Oil Corp. v. FERC,* 706 F.2d 444, 453 (3d Cir.1983); *Manganaro Bros., Inc. v. Gevyn Construction Corp.,* 610 F.2d 23, 24–25 (1st

Cir.1979); *Wheeling Valley Coal Corp. v. Mead,* 186 F.2d 219, 222–23 (4th Cir.1950). The technical formulation of this conclusion is that "supervening impossibility"—that is, impossibility arising after the promisor broke the contract—is a defense. This implies that even if AGNS made no effort to get a license, if its efforts would have been crowned by failure it could still plead force majeure. If, contrariwise, AGNS could have gotten a license, then there was no supervening impossibility—a promisor cannot disable himself from carrying out his promise and then complain that, by virtue of that disability, performance is impossible. *Kama Rippa Music, Inc. v. Schekeryk,* 510 F.2d 837, 842–43 (2d Cir.1975). (He would be like the person who murdered his parents and then asked for mercy on the ground that he was a poor orphan.) But AGNS could not have gotten a license even if it had been diligent, so it was not a self-inflicted disability that disabled it.

The doctrine of supervening impossibility—or supervening force majeure, since for this as for many purposes impossibility and force majeure are treated alike unless the language of the contract warrants a difference, and in this respect it does not—could be questioned as an original matter. Liability for breach of contract is strict—the plaintiff need not show that the defendant willfully or even negligently broke the contract—and defenses such as force majeure can be viewed as efforts to mitigate the strictness. If the breach is not involuntary but indeed willful, why should the burden of an event that makes performance impossible fall on the victim, a completely innocent party? Why in other words should the doctrine of impossibility allow the promisor by his deliberate breach to shift a contractually assumed risk to the promisee? Against this it can be argued that the contract did *not* assign the risk of a governmental ban on reprocessing to AGNS—on the contrary, the force majeure clause explicitly assigned it to Edison—and it is the materializing of *that* risk that did Edison in. In any event, the recent cases, which I have cited above, indicate no movement away from the doctrine of superven-

ing impossibility, and I shall assume its continued validity.

This is decisive against the argument that AGNS's foot-dragging debars it from pleading force majeure. There is much evidence that, from shortly after the signing of the contract, AGNS decided not to go forward with commercial reprocessing but instead to try to sell Barnwell to the government. AGNS's foot-dragging may evidence moral dereliction, but it did not bring about the circumstances that prevented it from obtaining an operating license.

Edison's second argument is that even if the Nuclear Regulatory Commission's order of December 23, 1977, was force majeure, AGNS failed in its duty to use its best efforts to eliminate the force at the earliest opportunity. The argument clearly fails, as a matter of law, for the period between December 23, 1977, and August 13, 1980, the date on which the Commission asked for comments on resuming the licensing proceedings. The duty of "continuing diligence," as I shall dub the duty to remove an obstacle to performance, is not a duty to exert heroic efforts to change laws, regulations, or policies of general applicability. *Glickman v. Coakley,* 22 Ohio App.3d 49, 53, 488 N.E.2d 906, 912 (1984). To seek a variance from a zoning ordinance might well be regarded as encompassed by the duty to make a bona fide effort to avoid an excusing condition, as held in *G.W. Andersen Construction Co. v. Mars Sales,* 164 Cal.App.3d 326, 338, 210 Cal. Rptr. 409, 416 (1985). But to oppose the highest governmental authorities, no. This observation is related to my earlier point that the force majeure events here included government orders as well as a failure to obtain an operating license.

Third, however, if the force majeure condition was "temporary" rather than "permanent," AGNS's duty to perform may merely have been postponed, rather than excused, by the order of December 23, 1977: specifically, postponed to August 13, 1980. Restatement (Second) of Contracts, *supra,* § 269. The dichotomy of "temporary" and "permanent" seems at first

glance inapt to regulatory force majeure. Unless the force majeure destroys the subject matter of the contract or one of the parties, it is never permanent in a literal sense. A law, a regulation, a decree, can always be repealed. One would have to wait until the end of time to pronounce a legal ban permanent. However, the point of distinguishing between temporary and permanent conditions constituting impossibility or impracticability or force majeure is merely to prevent the promisor from walking away from the contract because of some transitory impediment to performance. When the conditions preventing performance persist throughout the life of the contract, they are permanent enough to excuse liability. It would be neither efficient nor fair to impose on the promisor a perpetual duty of readiness to perform if and when the regulatory ban was lifted.

But here the regulatory ban was lifted before the promisor's duty expired; more precisely, there was an opportunity to try to lift the ban—by responding positively to the NRC's request for comments in 1980— that the promisor forewent. I shall assume, therefore, consistent with the Third Circuit's *Westinghouse* decision, that the ban was temporary. It makes no difference in this case. A temporary legal ban on performance is an excuse for permanent nonperformance if by the time the ban is lifted performance has become "materially more burdensome," whether or not such infeasibility would have been an excusing condition initially. *Autry v. Republic Productions, Inc.*, 30 Cal.2d 144, 157, 180 P.2d 888, 891, 896 (1947); Restatement (Second) of Contracts, *supra*, § 269, comment a. Edison contests this principle, pointing out that New York courts do not allow a promisor to be discharged merely on the ground that the expense of performance has increased since the contract was signed. *407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp., supra*, 23 N.Y.2d at 281–82, 296 N.Y.S.2d at 343, 244 N.E.2d at 41. Of course not. That would undermine a fundamental purpose of contracts, which is to assign the risk of unforeseen events—and normally the risk of an unforeseen increase in the costs of performance is assigned to the performing party, who is assumed to be more knowledgeable about this risk, as well as to have superior ability to prevent it from occurring. None of the cases cited by Edison addresses the situation where, *upon the expiration of a period of temporary impossibility* during which the duty of performance was suspended, the cost of performance has risen substantially. It is in those cases and those cases only that the "materially more burdensome" proviso kicks in, excusing resumption of performance on the basis of a reason that would not have been an excuse initially had performance not been suspended temporarily by reason of impossibility or force majeure.

Was this pass—performance become materially more burdensome—reached by 1980 when AGNS failed to take measures, in response to the NRC's invitation, to persuade the Commission to rescind the moratorium? Indeed so—and this is a certainty, a fact not open to question and one which I do not understand Edison to be questioning. In the words of one of its own executives, writing in 1981, "The commercial viability of spent fuel reprocessing was virtually destroyed by the Government actions which, four years ago, precipitously halted all reprocessing development work, terminated the [environmental] hearings and caused the more than half-completed Barnwell facility to be virtually abandoned. This could happen again. Therefore, it will be difficult to persuade investors to put up much risk capital to finance another such venture without significant positive action by the federal government." He had not changed his mind by 1982 when he wrote that "the reprocessing and storage of spent fuel is uniquely lacking in investment attractiveness today," "there is almost no economic incentive for a nuclear power operator to have his fuel reprocessed," and "given today's regulatory disincentives, most nuclear power reactor owners would rather not even try for reprocessing."

It is true that in the ordinary course of performance discharges made by Edison in 1979 would not have been received by AGNS for reprocessing until 1980 or even 1981, and if by exercise of due diligence

AGNS could have obtained an operating license by then it may seem that the regulatory moratorium did not interfere with its performance—the force majeure clause did not kick in at all—as to those discharges. This cannot be right. The NRC's order of December 23, 1977, ushered in a period of more than two years during which AGNS could not move an inch toward obtaining an operating license. This period, described by the Department of Energy as one of *indefinite* deferral of nuclear reprocessing, was a period during which AGNS's duty to perform was suspended by force majeure. Although the deferral was temporary, it excused AGNS permanently if, when performance was again possible, the cost of performance had so risen that it would be materially more burdensome than if the force majeure event had never occurred. It would be; this is neither a contested nor a contestable fact. It follows that AGNS was discharged on December 23, 1977.

Could it have been discharged even earlier? Not on force majeure grounds, as we have seen. In its brief commenting on my proposed opinion, AGNS attempts to revive a number of alternative theories of force majeure wisely—and definitively—abandoned in AGNS's response to Edison's motion for summary judgment on liability. Fed.R.Civ.P. 56(e); N.D.Ill.R. 12(m). They include not only the suggestion that "public opposition" includes any submission to the Nuclear Regulatory Commission opposing a proposed license, but also such fantasies as that the spent nuclear fuel could not have been transported from Edison's plants to Barnwell. The evidence to the contrary presented by Edison in support of its motion for summary judgment was conclusive.

■ But AGNS has another string to its bow. Section 17.1(b) of the contract provides that if despite due diligence AGNS fails to obtain an operating license by October 1, 1977, "then upon nine (9) month's [*sic*] prior written notice to the other party, either party may terminate this Agreement as it applies to fuel discharged subsequent to the date on which such notice was given." AGNS gave Edison written notice of termination on December 30, 1976, nine

months before October 1, 1977, and argues that the clause I have just quoted permitted it to terminate the contract with respect to all discharges after December 30, 1976. Were it not for the reference to "date on which such notice was given," the natural reading would be that if AGNS despite all due diligence had not obtained an operating license by October 1, 1977, either it or Edison could give notice of termination, and termination would be effective nine months later. But the last passage I have quoted makes termination effective on the date notice was given. So what is the significance of the nine months? One possibility is that it allows AGNS to anticipate its failure to obtain a license, provided it gives notice nine months before October 1, 1977. Suppose that on December 30, 1976, it knew that it could not obtain an operating license by October 1, 1977; the handwriting was on the wall. Indeed it was. Section 17.1(b) may have allowed it to limit its liability by canceling the contract up to nine months before October 1, 1977, that is, as early as December 30, 1976.

I cannot say that section 17.1(b) *unambiguously* means this, however, and Edison is therefore entitled to present evidence that the parties intended the contract to be terminable nine months *after* October 1, 1977, and hence long after the force majeure defense kicked in. (An alternative possibility is that the contract was terminable *on* October 1, 1977; this interpretation, too, would make section 17.1(b) irrelevant to this case, since no fuel discharged on or after October 1 would have been ready for delivery to AGNS by December 23, the force majeure date.) So the meaning of section 17.1(b) is an issue for trial—the only liability issue for trial.

Even if AGNS was entitled to terminate the contract on December 30, 1976, this was provided that it used due diligence, up through October 1, 1977, to obtain a license. It might seem that this would be another question that could not be decided on summary judgment. It is in fact a complex and vigorously contested issue of fact. But it is not a material issue. For we know that AGNS could not have obtained a license by October 1, 1977, no

matter how much diligence it had exhibited; it could at most have obtained an interim license that would have been suspended in 1976 until long after October 1, 1977, came and went. This being so, it can make no legal difference whether AGNS used due diligence or not. The breach of a condition is material, as we have seen, only if the breach is causally related to the event that the condition is designed to prevent. If AGNS used due diligence and failed to obtain a license, it was excused; if it failed to use due diligence, and would have gotten a license had it used due diligence, it was not excused; but if it failed to use diligence and would *not* have gotten a license had it used due diligence, then it exercised all the diligence that was due—none—and it is excused by the requirement of causation. The last is this case, incontestably.

There is a practical reason for excusing a failure to exercise due diligence in circumstances where it would have made no difference. Diligence is costly, and contract law does not seek to create incentives to incur costs that have no benefits—that serve merely to stake a claim. A party should not be penalized for failing to incur costs that would have conferred no benefit on anybody. That is the situation here. To repeat an essential point of my analysis, if AGNS had done all that the principles of due diligence could be thought to require it to do, it still would not have obtained a license; the money spent on diligent pursuit of a license would have been money down the drain.

■ If the jury finds that AGNS lawfully terminated the contract on December 30, 1976, the issue of force majeure becomes irrelevant to liability but remains relevant to damages. The distinction between discharge date and tender date is critical here. Spent fuel discharged before December 30, 1976, might not be ready for delivery to AGNS for many months, because of the time needed to cool the spent fuel. Suppose some of it was not ready for delivery until sometime after December 23, 1977. Force majeure would excuse AGNS from having to accept that delivery, take title to the fuel involved, and become liable for Edison's costs of storing that fuel.

The other motions before me pertain to damages.

■ 2. AGNS asks me to rule that it is not liable for Edison's costs of storing the spent nuclear fuel that AGNS was required to take. These costs, says AGNS, are consequential damages which both the contract and the principles of contract law stemming from *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng.Rep. 145 (1854) (still the leading case on the limitation of contract damages to those that are reasonably foreseeable) make nonrecoverable. There is no merit to AGNS's argument, which has been twice rejected by district judges presiding over this case. I could invoke the law of the case doctrine and refuse to reexamine the issue, for nothing has surfaced in discovery since those judges ruled to affect their analysis. But I will not do that, and will instead decide the question on the merits. The storage costs are not consequential damages. They are classic incidental damages, hence recoverable. *Ernst Steel Corp. v. Horn Construction Division*, 104 A.D.2d 55, 60, 481 N.Y.S.2d 833, 839 (1984), modified on other grounds, 109 A.D.2d 1104, 486 N.Y.S.2d 1022 (1985). Alternatively, they are an expense incurred by Edison to store AGNS's property—for title passed to so much of the spent nuclear fuel as was ready for delivery to AGNS before AGNS was excused from further performance by force majeure. This distinguishes the present case from *Florida Power & Light Co. v. Westinghouse Electric Corp.*, 826 F.2d 239, 278 (4th Cir.1987), where on similar facts the court deemed storage costs to be consequential damages. There is no indication in that case that the reprocessor had agreed to take title. There was such an agreement here and it made storage costs a clearly foreseeable consequence of AGNS's breaking its contract. I deny AGNS's motion for summary judgment with respect to storage costs.

■ 3. There is, however, merit to AGNS's request for partial summary judgment dismissing Edison's claim to be entitled to measure its storage costs by the

"market value" of services for the storage of the spent nuclear fuel that AGNS refused to accept before the Commission's ban discharged AGNS's obligations under the contract. Edison estimates the market value of these services at more than six times its actual costs of storing the spent nuclear fuel that AGNS refused to take. It bases that estimate on the price that AGNS contemplated charging for the storage of spent nuclear fuel at a time when it still expected to enter the reprocessing business.

A market for the storage of spent nuclear fuel has never come into existence, so the argument is academic. An even more fundamental objection to Edison's "market value" measure of damages is that the purpose of contract damages is to put the victim of the breach in the financial position he would have occupied had there been no breach, rather than to confer a windfall on the victim. "[T]he injured party should not recover more from the breach than he would have gained had the contract been fully performed." *Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 382, 357 N.Y.S.2d 857, 860, 314 N.E.2d 419, 421 (1974). If the contract had been performed, Edison would have been relieved of the costs of storing its spent nuclear fuel on site—period. Indeed, it is the straightforward character of Edison's loss that scotches AGNS's attempt to plead a *Hadley* defense.

This might be a different case if, but for the breach, Edison would have had surplus on-site storage space to rent out at the high "market value" it claims for the storage of spent nuclear fuel. Then it would have a lost profit that it might be able to recover from AGNS—or might not, depending on the *Hadley* question, which would then arise in acute form. *Wallace Steel, Inc. v. Ingersoll–Rand Co.*, 739 F.2d 112, 115 (2d Cir.1984). But Edison has never alleged that it would have had such a profit. *Ernst Steel Corp. v. Horn Construction Division, supra,* 104 A.D.2d at 64, 481 N.Y.S.2d at 840. To this point AGNS's undisputed evidence that no market for the storage of spent nuclear fuel has ever come into existence is relevant, but it is the icing on the cake.

Edison also claims the market value of spent-fuel storage on a theory of unjust enrichment, and although it concedes that this is an alternative ground that would be pertinent only if I had found no breach of contract, the principal case it cites for its market value breach of contract damages theory is an unjust enrichment case. *New York State Energy Research & Development Authority v. Nuclear Fuel Services, Inc.*, 97 F.R.D. 709, 714 (W.D.N.Y.1983). Edison has never explained satisfactorily its unjust enrichment claim. Maybe the idea behind it is the following. Section 16 of the contract required AGNS to take title to the spent fuel. If it had done so, it would have had to store the stuff, since it couldn't reprocess it. By breaking the contract, AGNS foisted its spent fuel on poor Edison, forcing Edison to perform storage services for AGNS for which Edison should be entitled to compensation at the market rate for storage services that would have existed if such a market had ever come into being.

Unjust enrichment is a standard remedy for willful takings or other violations that the law wants to make worthless to the violator by confiscating his profits, even though the result may be a windfall for the plaintiff. Dobbs, Remedies 222–24 (1973). AGNS had no profits. For this and the other reasons I have discussed, AGNS's motion for summary judgment on Edison's claim for the "market value" of storing the spent fuel that AGNS wrongfully refused to take is granted.