**WATSON LABORATORIES, INC., Plaintiff,**

v.

**RHÔNE–POULENC RORER, INC., et al., Defendants.**

**No. CV 99–7947 AHM.**

United States District Court, C.D. California.

April 20, 2001.

Kevin E Gaut, Patricia H Benson, Jeffrey D Goldman, Thomas P Lambert, Ka-

rin G Pagnanelli, Mitchell Silberberg & Knupp, Los Angeles, CA, for plaintiff.

Rodney Joseph Stone, Wayne M Barsky, Gregory L Doll, Victoria C. Shapiro, Gibson Dunn & Crutcher, Los Angeles, CA, Michael F. Quinn, David J. Sheehan, Pamela M. Madas, James M. Lee, Gibbons Del Deo Dolan Griffinger & Vecchione, Newark, NJ, for defendants.

## ORDER GRANTING WATSON'S MOTION FOR PARTIAL SUMMARY JUDGMENT IN PART AND GRANTING IN PART AND DENYING IN PART RHÔNE–POULENC'S FOUR MOTIONS FOR PARTIAL SUMMARY ADJUDICATION

MATZ, District Judge.

### INTRODUCTION

This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Motion") and Defendants' four separate Motions for Partial Summary Adjudication ("Defendants' Motions"). This dispute between pharmaceutical companies arises out of Defendants' alleged breach of its contractual obligations to supply Plaintiff with the hypertension drug Dilacor XR® and to not compete with Plaintiff in that drug market.

Plaintiff's omnibus, sprawling Motion seeks to establish that (1) Defendants breached the two contracts at issue; (2) Defendants may not rely on a *force majeure* affirmative defense; (3) Defendants' Third, Fifth and Eighth Affirmative Defenses (unclean hands, waiver and mitigation) to liability for breach of their supply obligations fail; (4) Defendants' Sixth and Ninth Affirmative Defenses (laches and good faith competition) are no defense to breach of the non-compete provisions; (5)

the U.S.-based defendant parent company is liable for breaching the contracts signed by its subsidiaries (also defendants); (6) Defendants' counterclaim for a declaratory judgment that they are not in breach of the non-compete provision fails; and (7) Defendants engaged in unfair competition in violation of Cal. Bus. & Prof.Code § 17200.

Defendants' First Motion seeks a determination that Plaintiff is not entitled to "disgorgement" of profits as a remedy under Cal. Bus. & Prof.Code §§ 17200, 17203. Defendants' Second Motion seeks to establish that Plaintiff may not recover lost profits incurred after Defendants' supply obligation terminated. Defendants' Third Motion seeks a ruling that the event that caused their breach of the supply commitment qualifies as a *force majeure* event. Defendants' Fourth Motion seeks summary judgment on Plaintiff's Cal. Bus. & Prof.Code § 17200 claim.

The Court concludes, first, that no material factual disputes prevent the Court from construing the relevant contractual provisions to find liability on the breach of contract claims. Next, Plaintiff may proceed only on the "unlawful" prong of Cal. Bus. & Prof.Code § 17200 and that claim must be resolved at trial. Third, Plaintiff may not recover "disgorgement" of Cardizem CD® profits under § 17203. Finally, all other damages issues must be resolved at trial. Accordingly, the Court GRANTS Plaintiff's Motion in part, GRANTS in part Defendants' First and Fourth Motions for Partial Summary Adjudication and DENIES Defendants' Second and Third Motions for Partial Summary Adjudication.

### FACTS [1]

#### I. Background

The following summary reflects that the very names (and the abbreviations the par-

---

[1] The facts are undisputed unless otherwise noted.

ties used for those names), identities and interrelationships of Defendants (and of affiliated parties) is confusing. It would have been helpful to the Court if at least one of the very lengthy sets of briefs had contained a glossary. Here is one the Court prepared, to assist the reader.

| Referred to as: | Full Name | Relationship & Definition |
| --- | --- | --- |
| Watson | Watson Laboratories, Inc. | Plaintiff |
| RPR | Rhone–Poulenc Rorer, Inc. | Defendant, parent/owner of RPRPI and RPPI. U.S.-based "headquarter company." |
| RPSA | Rhone–Poulenc, S.A. | Non-party, RPR's European parent. |
| RPRPI | Rhone–Poulenc Rorer Pharmaceuticals, Inc. | Defendant, signatory to the Supply Agreement. RPR's wholly-owned subsidiary and main pharmaceutical operating company of the RPR group of companies in the U.S. |
| RPPI | Rorer Pharmaceutical Products Inc. | Defendant, signatory to the License Agreement. RPR's wholly-owned subsidiary and holding company for intangible rights, including pharmaceutical patents and trademarks. |
| Centeon | Centeon LLC | Non-party, 50% owned by RPR through an indirect wholly-owned subsidiary. Pharmaceutical manufacturing facility. |
| HMR | Hoechst Marion Roussel, Inc. | Non-party, U.S. subsidiary of Hoechst (a German company). Manufacturer and seller of Cardizem CD. |
| Aventis | Aventis, S.A. | Non-party, RPSA's name after the merger of Hoechst into RPSA. |
| API | Aventis Pharmaceuticals, Inc. | Non-party, new name for HMR after the merger. |
| APPI | Aventis Pharmaceuticals Products, Inc. | New name for RPRPI after the merger. |
| Dilacor XR | | Subject of the License and Supply Agreements. Hypertension drug containing the active ingredient diltiazem. |
| Cardizem CD | | Hypertension drug containing the active ingredient diltiazem. |

On June 30, 1997, Watson and two of Rhone–Poulenc Rorer, Inc.'s ("RPR") subsidiaries (collectively the "RPR entities" or "Defendants") entered into six interrelated contracts effecting the transfer by the RPR entities to Watson of exclusive rights to Dilacor XR®, a hypertension drug con-

taining the chemical compound diltiazem. Watson's Separate Statement of Uncontroverted Facts ("UF") ¶ 1. Among the six contracts were "(a) a Manufacturing and Supply agreement ('Supply Agreement') signed by RPR's wholly owned subsidiary, then named Rhone–Poulenc Rorer Pharmaceuticals, Inc. ('RPRPI')[ ] and (b) a License Agreement." Watson's UF ¶ 2. The License Agreement was signed by another RPR subsidiary, Rorer Pharmaceutical Products, Inc. ("RPPI"). Watson's UF ¶ 3. "RPR is the 'headquarter company' which holds participations in its worldwide affiliates." Watson's UF ¶ 4. "RPRPI is the main pharmaceutical operating company of the RPR group of companies in the United States." Watson's UF ¶ 5. "RPPI is a holding company for intangible rights, including pharmaceutical patents and trademarks." Watson's UF ¶ 6.

"Under the Supply Agreement, RPRPI agreed to supply (on a cost plus basis) all of Watson's requirements of Dilacor XR® through June 30, 1999." Watson's UF ¶ 7. In Paragraph 3.2(a) of the separate License Agreement RPPI agreed: "[A]s an inducement to Watson to enter into this Agreement RPPI agrees . . . RPPI shall not, and will cause each of its Affiliates [2] not to, directly or indirectly . . . (i) in the U.S.A. produce, supply, market, distribute or sell any pharmaceutical product con-

taining diltiazem that competes with the Product, or acquire, own or maintain an interest in any Person that in the U.S.A., directly or indirectly supplies, markets, distributes or sells any such pharmaceutical product, as a direct or indirect proprietor, partner, stockholder, officer, director, principal, agent or trustee." [3] Watson's UF ¶ 26.

## II. Supply Agreement

"When Watson and RPRPI signed the Supply Agreement, RPR owned (through a[n 'indirect' wholly-owned] subsidiary) 50% of a company called Centeon LLC ('Centeon')." Watson's UF ¶ 8; RPR's Statement of Genuine Issues ("SGI") ¶ 8. "Centeon operated a manufacturing plant in Kankakee, Illinois, which the Federal Drug Administration ('FDA') had approved to manufacture Dilacor XR®." Watson's UF ¶ 10. "As of June 30, 1997, Centeon had been manufacturing Dilacor XR® at the Kankakee plant for RPR under a January, 1996 contract between RPR and Centeon (the Toll Manufacturing Agreement). RPRPI relied on this contract to obtain from Centeon the Dilacor XR® needed to satisfy RPRPI's obligations to Watson under the Supply Agreement." Watson's UF ¶ 11.

"At the time the parties signed the Supply Agreement, Centeon was operating under an FDA Consent Decree, to which

---

**2.** " 'Affiliates' is defined as RPR and Persons 'directly or indirectly controlled by RPR.' " Watson's UF ¶ 27. " 'Control' means 'the direct or indirect ownership of over 50% of the outstanding voting securities of a Person, or the right to receive over 50% of the profits or earnings of a Person.' " Watson's UF ¶ 28. Defendants do not dispute the contract terms but argue that they "expressly limited the scope of 'affiliate' to exclude from its reach RPR's European parent[, Rhone–Poulenc, S.A. (or 'RPSA') ] because RPR could not bind its parent and was not apprised of the parent's future plans." RPR's SGI ¶ 27.

**3.** At the time the License Agreement was executed, there were three branded diltiazem products available: Dilacor XR® to be distributed by Watson, Tiazac made by Forest Laboratories and Cardizem CD® made by Hoechst Marion Roussel, Inc. Cockburn Decl. ¶ 5(b). In 1998, generic diltiazem appears to have been sold by Watson, Mylan and Andrx. Cockburn Decl. Ex. A at 15. In 1999, Apotex entered the generic diltiazem market and by 2000 Faulding and Teva had also entered that market. *Id.*

Centeon had stipulated in January, 1997." Watson's UF ¶ 12. "The Consent Decree resulted from an FDA inspection that had found the Kankakee plant in violation of numerous 'current Good Manufacturing Practices' ('cGMP'), which are established by FDA regulations." Watson's UF ¶ 13. "The Consent Decree provided, among other things, that if Centeon failed to comply with cGMP requirements, the FDA could immediately order Centeon to stop all manufacturing of pharmaceutical products." Watson's UF ¶ 14.[4] It appears that "[t]he Kankakee facility was the only site in the world approved by the FDA to manufacture [Dilacor XR®]. Accordingly, the only source of supply of the Dilacor products in the world was through the Centeon facility." RPR's SGI ¶ 15.

"Watson wanted RPRPI itself to remain fully liable for the obligation to manufacture Dilacor XR®. The parties included in the Supply Agreement Paragraph 2.1, which provides: ... [D]uring the term of this Agreement, RPRPI shall supply Watson with all of its requirements of the Product [Dilacor XR®] .... The parties acknowledge that RPRPI may cause some or all of its obligations under this agreement ... to be performed on RPRPI's behalf by the Designated Manufacturer [Centeon]; provided, however, that RPRPI shall be and remain fully liable hereunder for the performance of all such obligations." ' Watson's UF ¶ 16.

"At Watson's insistence, the parties added a covenant to the Supply Agreement (Paragraph 9.1) obligating the RPR Entities to maintain at all times the capability to manufacture Dilacor XR®, not just through Centeon, but through their own plants if necessary. Paragraph 9.1 reads: 'During the term of this Agreement, RPRPI or its Affiliates [defined to include RPR] shall maintain at all times either itself or through the Designated Manufacturer [Centeon], the manufacturing capacity and capabilities which shall allow it to satisfy the provisions of this Agreement and timely supply the Product to Watson in accordance with the terms of this Agreement.' " Watson's UF ¶ 17.

RPR disputes whether it was obligated to maintain the capacity to manufacture Dilacor XR® at another site: "Watson's characterization of [Paragraph 9.1] as reflecting the parties' intention that RPR would have a backup site for the manufacture of the product ... is absolutely false. As noted previously, the only facility in the world approved to manufacture the Dilacor Products was the Kankakee facility." RPR's SGI ¶ 17.

"On May 11, 1998, the FDA began another inspection of Centeon's Kankakee plant." Watson's UF ¶ 18. "As a result of the May–July, 1998 FDA inspection, the FDA on August 13, 1998 delivered a letter to Centeon directing it to 'immediately and until further written notice from the FDA' cease manufacturing any drugs at Kankakee, except those identified as 'medically necessary.' The FDA did not deem Dilacor XR® [to be] 'medically necessary.' " Watson's UF ¶ 19. "The FDA ordered this 'shutdown' of the Kankakee plant because the FDA had observed during its inspection 'numerous deviations from the [cGMP] regulations[ ], as well as the Federal Food Drug and Cosmetic Act (FDCA) and the Public Health Service Act

---

4. RPR does not refute the truth of this statement, but it would add the following: "This statement fails to mention that Watson was fully apprised of the terms of the Consent Decree before entering into the transaction to acquire the rights to the Dilacor Products.

Watson received all of the information that Watson felt it needed about Centeon in the course of its due diligence and was 'satisfied' with Centeon's ability to manufacture the Dilacor products." RPR's SGI ¶ 14.

(PHSA).' The FDA concluded that 'Centeon has failed to comply with the Consent Decree and has violated the law.'" Watson's UF ¶ 20. "On August 14, 1998, RPR notified Watson of the shutdown, stating that '[a]s a consequence of this action, RPR is not now in a position to supply any additional Dilacor XR ® product, nor do we know at this time when Centeon will be able to resume production and distribution of Dilacor XR®."' Watson's UF ¶ 21. "After the August 13, 1998 shutdown, Centeon never resumed manufacturing Dilacor XR®." Watson's UF ¶ 22.

## III. License Agreement

The 1997 License Agreement prevents RPPI, RPR or any other RPR affiliate from maintaining an interest "as a direct or indirect ... officer, [or] director ..." in any entity that "directly or indirectly supplies, markets, distributes or sells" a competing product. Watson's UF ¶ 26. "Before December 15, 1999, Rhone–Poulenc, S.A., a French company ("RPSA"), was the parent of RPR ..." Watson's UF ¶ 29. Hoechst, a "German company[,] ... was the parent of a Delaware corporation known as Hoechst Marion Roussel, Inc. ('HMR')." Watson's UF ¶ 29. "HMR manufactured and sold Cardizem CD, a pharmaceutical product containing diltiazem that was the principal competitor of Dilacor XR®." Watson's UF ¶ 30. "On December 1, 1998, RPSA and Hoechst announced that they were going to merge their worldwide pharmaceutical business (including those operated by their United States subsidiaries) into a new company called 'Aventis.' The merger was consummated on December 15, 1999." Watson's UF ¶ 31. After that merger, affiliates or subsidiaries of Aventis have continued the business of HMR by selling Cardizem CD®. RPR's SGI ¶ 36.

Whether RPR or an "affiliate" of RPR, within the meaning of the 1997 License Agreement, now sells or ever sold Cardizem CD® in violation of the non-compete provisions of that License Agreement is the key, threshold issue. Plaintiff, relying on evidence tending to negate the practical "separateness" of the corporate entities after the merger, says "yes." Defendants answer "no." They submit evidence that they attempted to preserve the separate corporate existence of RPR and its "affiliates" in the wake of the Aventis merger. However, Defendants do not dispute that former officers of the RPR entities serve on the board of directors of API, the company that sells Cardizem CD®. Watson's UF ¶¶ 71, 81–82. In fact, the same individuals constitute the board of directors of both API and APPI (formerly RPRPI). Watson's UF ¶ 81. Moreover, former managers of the RPR entities serve on a single Aventis management team. Watson's UF ¶¶ 83–84.

## DISCUSSION

### I. Legal Standards For A Motion For Summary Judgment

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). A fact is material if it could affect the outcome of the suit under the governing substantive law. *Id.* at 248, 106 S.Ct. at 2510. The burden then shifts to the nonmoving party to establish, beyond the pleadings,

that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transportation Brokerage Co., Inc. v. Darden Restaurants, Inc.,* 213 F.3d 474, 480 (9th Cir.2000) (citations omitted). In contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. The moving party need not disprove the other party's case. *See Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. Thus, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial.'" *Cleveland v. Policy Management Sys. Corp.,* 526 U.S. 795, 119 S.Ct. 1597, 1603, 143 L.Ed.2d 966 (1999) (*citing Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552).

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." F.R.Civ.P. 56(e). Summary judgment will be entered against the non-moving party if that party does not present such specific facts. *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. *Id.; Beyene v. Coleman Sec. Serv., Inc.,* 854 F.2d 1179, 1181 (9th Cir. 1988).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie,* 526 U.S. 541, 119 S.Ct. 1545, 1551–52, 143 L.Ed.2d 731 (1999) (*citing Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513). But the non-moving party must come forward with more than "the mere existence of a scintilla of evidence." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citation omitted).

Simply because the facts are undisputed does not make summary judgment appropriate. Instead, where divergent ultimate inferences may reasonably be drawn from the undisputed facts, summary judgment is improper. *Braxton–Secret v. A.H. Robins Co.,* 769 F.2d 528, 531 (9th Cir.1985).

## II. Breach of the Dilacor XR® Supply Agreement and License Agreement

Plaintiff's First Amended Complaint ("FAC") seeks injunctive relief and damages against RPR and RPRPI for RPRPI's alleged breach of the Supply Agreement. Plaintiff's Motion seeks to establish that (1) RPRPI breached the Supply Agreement, (2) Defendants may not rely on a *force majeure* affirmative defense to excuse the breach of the Supply Agreement; (3) Defendants' Third, Fifth and Eighth Affirmative Defenses (unclean hands, waiver and mitigation) to liability for breach of their supply obligations fail; and (4) RPR is liable for RPRPI's breach.

Defendants' Third Motion seeks a ruling that the Centeon shutdown that caused their breach of the supply commitment qualifies as a *force majeure* event under Article VIII of the Supply Agreement.

Plaintiff's FAC also seeks injunctive relief against RPR and RPPI for RPPI's alleged breach of the non-compete provisions in the License Agreement. Plaintiff's Motion seeks to establish that (1) RPPI breached the License Agreement; (2) RPR is liable for RPPI's breach of the License Agreement; (3) RPR's and RPPI's counterclaim for a declaratory judgment that they are not in breach of the non-compete provision fails; and (4) the Sixth and Ninth Affirmative Defenses (laches and good faith competition) to breach of the License Agreement fail.

### A. Contract Interpretation

■■■■ Neither party disputes that interpretation of the contract provisions at issue here is for the Court and not a jury. RPR's Mem. of P. & A. in Supp. of Third Mot. at 6–7; Watson's Motion (arguing that the Court should construe the contract terms to find that RPR breached the License Agreement and the Supply Agreement). California law is in accord with this principle.[5]

"The interpretation of a written instrument, even though it involves what might properly be called questions of fact [citation], is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instru-

ment may be given effect. [Citations.] Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible' [citations], and it is the instrument itself that must be given effect. [Citations.] It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence...."

*Greater Middleton Association v. Holmes Lumber Company*, 222 Cal.App.3d 980, 271 Cal.Rptr. 917, 923 (1990) (*quoting Parsons v. Bristol Development Co.*, 62 Cal.2d 861, 865–866, 44 Cal.Rptr. 767, 402 P.2d 839 (1965)). Here, any material extrinsic evidence is undisputed. Therefore, the Court will proceed to interpret the relevant agreements.

### B. *Force Majeure* Defense to Breach of Supply Agreement (Plaintiff's Motion and Defendants' Third Motion)[6]

Paragraph 9.1 of the Supply Agreement provides:

During the term of this Agreement, RPRPI or its Affiliates shall maintain at all times, either itself or through [Centeon], the manufacturing capacity and capabilities which shall allow it to satisfy the provisions of this Agreement and timely supply the Product to Watson in accordance with the terms of this Agreement.

Article VIII of the Supply Agreement provides:

---

**5.** The relevant agreements all contain a provision selecting New York substantive law as controlling any disputes "relating to or arising out of" each agreement. However, the Court analyzes the relevant contracts under California law because no party has suggested in the current motions that any other law is applicable. Both parties cite almost exclusively California law in their briefs.

**6.** It is otherwise undisputed that, absent a defense, RPRPI breached the Supply Agreement by failing to supply Plaintiff with "all of its requirements" of Dilacor XR ® for the duration of the Supply Agreement. *See* Watson's UF ¶¶ 22, 40; Gaut Decl. Vol. II Ex. 52, ¶ 2.1.

The obligations of RPRPI and Watson hereunder shall be subject to any delays or non-performance caused by: acts of God, earthquakes, fires, floods, explosion, sabotage, riot, accidents; *regulatory, governmental,* or military *action* or inaction: strikes, lockouts or labor trouble; perils of the sea; or failure or delay in performance by third parties, including suppliers and service providers; or any other cause *beyond the reasonable control of either party* ("Force Majeure Event"). The party which is not performing its obligations under this Agreement as a result of any such event of Force Majeure shall use commercially reasonable efforts to resume compliance with this Agreement as soon as possible.

*See* Gaut Decl. Vol. II. Ex. 52 at 14 (emphasis added).

The parties vigorously dispute the meaning and application of the *force majeure* provision in the Supply Agreement. Plaintiff's Motion seeks to establish that RPR and RPRPI cannot as a matter of law rely on the affirmative defense of *force majeure* provided in Article VIII of the Supply Agreement. Plaintiff argues that the government shutdown of Centeon does not qualify as a *force majeure* event because it was both foreseeable and could have been avoided had RPR exercised reasonable control over Centeon. Watson's Mot. at 8. Moreover, Plaintiff argues, even if the FDA's action constituted a *force majeure* as to the performance of RPR's subcontractor, Centeon, RPR's performance was not excused because it had an independent obligation to supply Plaintiff, even if Centeon could not.

Defendants' Third Motion appears to argue that as a matter of law they are not liable for breach of the Supply Agreement because Article VIII excused their performance obligations. They contend that after the FDA shutdown of the Centeon facility they were not required to perform under the Supply Agreement because of "an unambiguous term in the agreement that provides that a party's nonperformance due to supervening governmental action is excused . . ." RPR's Mem. of P. & A. in Supp. of Third Mot. at 9. However, Defendants' Reply in support of their Third Motion clarifies that they only seek a determination that the government ordered Centeon shutdown *qualifies* as a *force majeure* event under Article VIII, which would leave issues for the jury to resolve before Defendants could perfect an affirmative defense based on Article VIII.

1. **The *Force Majeure* Event Excusing Performance Must Have Been Beyond Defendants' Reasonable Control, so Defendants' Motion Must Be Denied. However, Whether Defendant Did Have Reasonable Control Is a Factual Issue, so to the Extent Plaintiff's Motion Seeking to Preclude *Force Majeure* Is Based on Defendant Having Reasonable Control It Must Be Denied**

It is not disputed that the FDA shutdown of Centeon was "governmental action" that at some level caused, or at least contributed to, RPR's nonperformance under the Supply Agreement. RPR argues that therefore the Court should simply give effect to the specifically-enumerated excusing events ("regulatory, governmental . . . action") agreed to by the parties. *See, e.g., Commonwealth Edison Company v. Allied–General Nuclear Services,* 731 F.Supp. 850, 855–56 (N.D.Ill.1990) (Posner, J.) (finding that because the parties "deal[t] with the question of regulatory *force majeure* with considerable specificity. . . . it is the contract, rather than a body of judicial doctrine, that I must interpret"); *Perlman v. Pioneer Limited Partnership,* 918 F.2d 1244, 1248 (5th Cir.1990)

("The language in the *force majeure* clause . . . is unambiguous and its terms were specifically bargained for by both parties. Therefore, the [common law] 'doctrine' of *force majeure* should not supersede the specific terms bargained for in the contract.").

■ RPR points to no evidence that the *force majeure* events listed in Article VIII were specifically negotiated by the parties, rather than mere boilerplate terms. *See Commonwealth Edison,* 731 F.Supp. at 855 ("including in the contract a standard, boilerplate, catch-all *force majeure* provision[ ] invokes a body of common law doctrine that is largely indistinguishable from the doctrine of impossibility (or impracticability) . . ."). Moreover, elements of the common law *force majeure* defense are often read into the *force majeure* provision of a contract. *Cf. Nissho–Iwai Co., Ltd. v. Occidental Crude Sales, Inc.,* 729 F.2d 1530, 1540 (5th Cir.1984) ("the California law of *force majeure* requires us to apply a reasonable control limitation to each specified event, regardless of what generalized contract interpretation rules would suggest"); *Neal–Cooper Grain Company v. Texas Gulf Sulphur Company,* 508 F.2d 283, 293 (7th Cir.1974) (applying elements of Uniform Commercial Code impracticability defense despite the fact that the contract contained a *force majeure* clause that specifically enumerated excusing events).

■ It is not clear whether the parties intended to apply the common law doctrine of *force majeure* or instead intended to supersede that doctrine with the express terms of Article VIII. The Court need not resolve this question because under either the common law of *force majeure* or the express terms of the contract, construed under California law, Defendants may only escape liability if the Centeon shutdown was "beyond the reasonable control of either party." [7] This is so because the plain language of Article VIII requires that any qualifying event, whether specifically enumerated or not, be "beyond the reasonable control of either party." *See Unicover World Trade Corp. v. Tri–State Mint, Inc.,* No. 91–CV–0255–B, 1994 WL 383244, at *10 (D.Wyo.1993) ("After considering the clause as a whole, the Court finds that 'beyond its control' modifies all of the listed causes in the clause."). Moreover, California law reads that element into express *force majeure* clauses anyway:

> We can not [sic] always be sure what 'causes are beyond the control' of the contractor. . . . No contractor is excused under such an express provision unless he shows affirmatively that his failure to perform was proximately caused by a contingency within its terms; that, in spite of skill, diligence and good faith on his part, performance became impossible or unreasonably expensive.

*Oosten v. Hay Haulers Dairy Employees & Helpers Union,* 45 Cal.2d 784, 291 P.2d 17, 20–21 (1955) (*quoting* Corbin on Contracts § 1342); *see also Nissho–Iwai,* 729 F.2d at 1540.

■ Because Article VIII requires that each and every excusing event be "beyond the reasonable control of either party," Defendants' Third Motion seeking a determination that the Centeon shutdown is a qualifying *force majeure* event under Article VIII must be DENIED. However, the Court declines to find as a matter of law that the Centeon shutdown was within the

---

7. Even if the Centeon shutdown was "beyond the reasonable control of either party," to qualify for the safe harbor of Article VIII, Defendants must further prove that they used "commercially reasonable efforts to resume compliance with [the Supply] Agreement as soon as possible."

"reasonable control" of Defendants, although it appears likely that Plaintiff can establish at trial that RPR could "control" Centeon because "RPR held half the positions on Centeon's Board." Watson's UF ¶ 47. Moreover, the RPR–Centeon Toll Manufacturing Agreement made RPR responsible for securing all required licensing, gave it primary responsibility for FDA and other regulatory compliance matters, obligated Centeon to cooperate with RPR and gave RPR rights of inspection at the Kankakee plant. *See* Gaut Decl. Vol. III, Ex. 58 at 1385. But whether the Centeon shutdown was "beyond the reasonable control" of Defendant nevertheless is a factual question that the Court cannot resolve on a motion for summary judgment.

**2. Nevertheless, Plaintiff's Motion Must Be Granted Because a *Force Majeure* Excusing Event Must Be "Unforeseeable" at the Time of Contracting Unless Even If Foreseeable It Is Specifically Agreed To Be a Qualifying Event, Which the Facts Preclude Here**

A closer question is whether, as Plaintiff contends, an event must be "unforeseeable" to excuse performance under Article VIII. Defendants vigorously argue that such a requirement cannot be read into Article VIII. However, as demonstrated above, California law requires (not "permits") that each event claimed to be a *"force majeure"* be beyond the control of the breaching party. *See Nissho–Iwai,* 729 F.2d at 1540. Plaintiff relies upon *URI Cogeneration Partners, L.P. v. Board of Governors for Higher Education,* 915 F.Supp. 1267 (D.R.I.1996), for the related but separate proposition that a foreseeability requirement may be read into a contractual *force majeure* provision that does not expressly contain any such requirement. In *URI,* the court found that the failure to obtain zoning approval did not

fall within one of the specifically enumerated *force majeure* events. Because Rhode Island law "provide[d] little guidance," the court cited New York cases to construe the rather elaborate *force majeure* clause narrowly:

> What distinguishes the Biblical plagues described in [the *force majeure* provision] from a failure to procure zoning permission is the question of foreseeability. As the Board points out, *force majeure* clauses have traditionally applied to unforeseen circumstances—typhoons, citizens run amok, Hannibal and his elephants at the gates—with the result that the Court will extend [the *force majeure* provision] only to those situations that were demonstrably *unforeseeable* at the time of contracting.

*Id.* at 1287 (emphasis added).

In *URI,* because "zoning was an issue long before" the contract was signed and because the defendant was the party who bore the risk that the lack of governmental approval would preclude performance under the contract, the court held that "failure to win zoning permission was a foreseeable event ... and not ... excused by *force majeure* ..." *Id.*

Other courts have found that contractual *force majeure* provisions which are silent on the issue of whether the excusing event must be unforeseeable should be construed to require unforeseeability. *E.g., Gulf Oil Corporation v. Federal Energy Regulatory Commission,* 706 F.2d 444, 453–54 (3d Cir. 1983) ("we conclude that in order to invoke the use of *force majeure* as an excuse under the warranty contract, Gulf as the nonperforming party must show that even though the events which delayed its performance were unforeseeable and infrequent that it had available at the time of their occurrence more than the maximum warranted quantity of gas"). Under Uni-

form Commercial Code § 2–615, contract performance will only be excused due to impracticability when the purportedly excusing events were unforeseen at the time the contract was executed. *InterPetrol Bermuda,* 719 F.2d at 999.

On the other hand, yet other cases indicate that a qualifying event need not be unforeseeable. *See, e.g., Perlman,* 918 F.2d at 1248 ("Because the clause labelled '*force majeure*' in the Lease does not mandate that the *force majeure* event be unforeseeable or beyond the control of [the nonperforming party] before performance is excused, the district court erred when it supplied those terms as a rule of law."); *Sabine Corporation v. ONG Western, Inc.,* 725 F.Supp. 1157, 1170 (W.D.Okla.1989) ("Plaintiff's argument that an event of *force majeure* must be unforeseeable must be rejected. Nowhere does the *force majeure* clause specify that an event or cause must be [ ] unforeseeable to be a *force majeure* event."); *Kodiak 1981 Drilling Partnership v. Delhi Gas Pipeline Corporation,* 736 S.W.2d 715, 720–21 (Tex.App.1987) (judicially inserting into a contractual *force majeure* provision "the requirement of unforeseeability has not been approved by any Texas court, state or federal"). None of these cases applies California law.

The case that the parties have focused on most vigorously, especially at the hearing, is *Eastern Air Lines, Inc. v. McDonnell Douglas Corporation,* 532 F.2d 957 (5th Cir.1976). Plaintiff Eastern Airlines sued the aircraft manufacturer McDonnell Douglas for breach of contract. The crux of the breach was that the defendant failed to deliver 99 airplanes in time. Defendant attributed the delay to a change in concerted governmental policies arising out of the Vietnam War, which caused production of military aircraft to be given priority. Plaintiff thus claimed the breach was excused. The parties agreed to apply California law to the interpretation and enforcement of the contract. The jury awarded more than $24 million in damages to Eastern Airlines. The Court of Appeals reversed. In a lengthy analysis of what it characterized as "The Foreseeability Issue." the Court made several observations that favor Watson.

● "Exculpatory provisions which are phrased merely in general terms have long been construed as excusing only unforeseen events which make performance impracticable.... Courts have often held, therefore, that if a promisor desires to broaden the protections available under the excuse doctrine he should provide for the excusing contingencies with particularity and not in general language.... [¶ W]e will adhere to the established rule of construction because it continues to reflect prevailing commercial practices." *Eastern Air Lines,* 532 F.2d at 990–91.

● "[B]ecause the purpose of a contract is to place the reasonable risk of performance on the promisor, he is presumed, in the absence of evidence to the contrary, to have agreed to bear any loss occasioned by an event which was foreseeable at the time of contracting.... Underlying this presumption is the view that a promisor can protect himself against foreseeable events by means of an express provision in the agreement.... [¶] Therefore, when the promisor has anticipated a particular event by specifically providing for it in a contract, he should be relieved of liability for the occurrence of such event regardless of whether it was foreseeable." *Id.* at 991–92.

Despite these observations, the Court of Appeals held that the trial court's instruction (not quoted in the opinion) was erroneous. The instruction was to the effect

that "no event could be an excuse unless it was not reasonably foreseeable at the time the particular contract was entered into." *Id.* at 965, 991. This holding is what Defendants tout, of course. They argue that Watson knew about the Centeon risk and that (as Justice Traynor stated, in language quoted by the Fifth Circuit in *Eastern Air Lines* ): "When a risk has been contemplated and voluntarily assumed . . . foreseeability is not an issue and the parties will be held to the bargain they made." *Id.* at 992.

■ The problem for Defendants is that the *force majeure* clause here does not even permit, much less entitle, them to point to the Centeon shutdown as an event giving rise to a *force majeure* defense even though it was foreseeable. The language referring to "regulatory, governmental . . . action" is vague and boilerplate. These words cannot reasonably be construed to reflect that the parties considered that the shutdown of the Centeon plant would be encompassed. In contrast, the clause in the Eastern Airlines–McDonnell Douglas contract was specific. It referred to precisely the kind of governmental action that (according to McDonnell Douglas) caused the delay: "any act of government, governmental priorities, allocation regulations or orders affecting materials, equipment, facilities or completed aircraft . . ." *Id.* at 963.

The Court holds that under these facts and as a matter of law, Defendants cannot rely on Article VIII to excuse their performance because the shutdown of the Centeon plant was both entirely foreseeable and not encompassed within the *force majeure* clause. In reaching this result, the Court is persuaded by the following factors:

1. Defendants have presented the Court with no evidence to overcome the presumption that RPRPI "agreed to bear any loss occasioned by an event which was foreseeable at the time of contracting," as was the Centeon shutdown. *See Eastern Air Lines,* 532 F.2d at 991–92. Defendants merely point to evidence that both Watson and RPRPI were fully aware of the previous problems at Centeon, not that they intended "regulatory, governmental . . . action" to encompass the shutdown of Centeon. *See* RPR's SGI ¶ 14 (Watson was fully apprised of the terms of the [Centeon] "Consent Decree" allowing for immediate FDA shutdown in the event of future cGMP violations).

2. RPRPI's express obligation under Paragraph 9.1 of the Supply Agreement to maintain "the manufacturing capacity and capabilities which shall allow it to satisfy the provisions of this Agreement" is inconsistent with allowing it to be excused from performance when the failure resulted (at least in part) from the foreseeable government shutdown of Centeon.

3. Most of the events enumerated in Article VIII are standard, boilerplate *force majeure* occurrences. True, some of the enumerated events, such as natural disasters, are a foreseeable possibility, especially in Southern California (albeit no one can be sure when "the Big One" will hit). But they also are "beyond the reasonable control of either party." In contrast, when parties expressly contemplate a known risk of a regulatory prohibition, they should be expected to allocate that risk expressly, rather than rely upon a boilerplate clause enumerating a parade of horribles that are so unlikely to occur as to make them qualitatively

different. In the absence of such allocation, only governmental action not previously contemplated could qualify as *force majeure*.

### C. Other Affirmative Defenses to Breach of the Supply Agreement

Plaintiff's Motion also argues that Defendants' Third, Fifth and Eighth Affirmative Defenses to liability (unclean hands, waiver and mitigation) fail. Defendants chose not to address Plaintiff's extensive arguments. In the title of the portion of their memorandum purporting to respond to these motions, Defendants claim that all of those defenses were directed to damages, not to Plaintiff's claims of liability for breach. What Defendants proceed to argue goes beyond that, however, although it is hard to tell what their position is because the language is remarkably elliptical. (*E.g.*, "The facts underlying this assertion [re unclean hands] and discussed by Watson in its brief addressing this defense, however, may well be explored at trial, depending, of course, on this Court's assessment of the relevance of those facts to issues at stake in this litigation as the trial unfolds." RPR's Opp. at 28.) What *is* clear is that Defendants chose not to deal with Plaintiff's various arguments.

Plaintiff's Motion clearly seeks to narrow the issues in this case on *both* liability and damages. To survive summary judgment and preserve their defenses for trial, Defendants were required to produce evidence in support of those affirmative defenses. *See Transco Leasing Corporation v. United States*, 896 F.2d 1435, 1448–49 (5th Cir.1990). Defendants have not done so. Because Defendants have failed to come forward with "specific facts showing that there is a genuine issue for trial," *see*

*id.*, or with *any* admissible evidence in support of such defenses, and because Plaintiff otherwise appears entitled to summary adjudication of these defenses, the Court GRANTS Plaintiff's Motion. The affirmative defenses of unclean hands, waiver and mitigation are dismissed to the extent they have been asserted against any claims related to the Supply Agreement. Defendants will *not* be permitted to introduce evidence as to mitigation.

### D. Non–Compete Provisions In The License Agreement

 Plaintiff further seeks summary judgment in its favor finding that Defendants breached their obligation not to compete with Plaintiff's sales of Dilacor XR®, in violation of Paragraph 3.2 of the License Agreement.[8] That paragraph provides in part:

> [A]s an inducement to Watson to enter into this Agreement RPPI agrees ... RPPI shall not, and will cause each of its Affiliates not to, directly or indirectly ... (i) in the U.S.A. produce, supply, market, distribute or sell any pharmaceutical product containing diltiazem that competes with the Product, or acquire, own or maintain an interest in any Person that in the U.S.A., directly or indirectly supplies, markets, distributes or sells any such pharmaceutical product, as a direct or indirect proprietor, partner, stockholder, officer, director, principal, agent or trustee.

Watson's UF ¶ 26. " 'Affiliates' is defined as RPR and Persons 'directly or indirectly controlled by RPR.' " Watson's UF ¶ 27. Plaintiff argues that Defendants breached this non-compete clause because (1) API, now part of the former RPSA, sells the

---

8. A ruling in Plaintiff's favor on this issue would also necessarily dispose of Defendants' counterclaim, which seeks a declaratory judgment that they are not in breach of the non-compete provisions.

competing diltiazem product Cardizem CD® and (2) the officers and directors of former RPR entities manage API.

Plaintiff relies upon the following facts, which Defendants do not dispute:

1. As of January 1, 2000. HMR/API and RPRPI/APPI ha[d] the exact same Board of Directors—Gerald Belle, Daniel Camus, Frank Dougles, Richard Markham, and Thierry Soursac. Watson's UF ¶ 81.

2. These directors consist of both former HMR and former RPR Entity officers. Watson's UF ¶ 82.

3. Aventis Pharmaceuticals[9] also now has a single management team, known as the "leadership team." consisting of managers from both the former HMR and the former RPR Entities. Watson's UF ¶ 83.

4. There is no longer any separate HMR/API or RPRPI/APPI managerial structure. Watson's UF ¶ 84.

Not only do Defendants not refute these facts, but they also do not address Plaintiff's contention that these facts show that Defendants breached Paragraph 3.2(a) of the License Agreement by maintaining an interest "as a direct or indirect ... officer, [or] director ..." in any entity that "directly or indirectly supplies, markets, distributes or sells" a competing product. *See* Watson's UF ¶ 26. Instead, Defendants argue that API's sales of Cardizem CD® are not precluded by the License Agreement because the "separateness" of these corporate entities bars a finding that the non-compete clause was breached. They contend that the License Agreement does not bind RPSA and it is RPSA, not RPR, that acquired HMR/API. There-

fore, Defendants argue, sales by RPSA/Aventis of Cardizem CD® (through API) cannot be imputed to any former RPR entities. Defendants further argue that Plaintiff expressly "negotiated away" any right to bind RPSA to the non-compete clause. However, such arguments do not negate Plaintiff's claim that Paragraph 3.2(a) precludes former officers and directors of the RPR entities from serving as officers and directors of any company, such as API, that sells products that compete with Dilacor XR®.

In a section of their opposition titled "The Competitive Landscape Remains Unchanged," Defendants basically argue that Plaintiff cannot suffer damages as a result of API's sales, because before the RPSA–Hoechst merger Plaintiff was competing against Hoechst/HMR anyway, given Hoechst/HMR's sales of Cardizem CD®. But the real question before the Court is what Defendants did, not what was the intended or actual effect of their conduct.

The undisputed facts upon which Plaintiff relies establish that Defendants breached Paragraph 3.2(a) of the License Agreement by maintaining an interest "as a direct or indirect ... officer, [or] director ..." in API, which "directly or indirectly supplies, markets, distributes or sells" a competing product.[10] Defendants have admitted (or failed to refute) facts facially sufficient to give rise to liability for breach of Paragraph 3.2(a) of the License Agreement, unless Defendants can establish an affirmative defense.

### E. Affirmative Defenses to Breach of the License Agreement

Defendants appear to argue in the alternative that they may not be liable for

---

**9.** Defendants concede that "Aventis Pharmaceuticals" may be used broadly to refer to HMR and RPRPI. Def.'s Opp. at 12.

**10.** In light of this ruling, the Court need not address Plaintiff's alternative argument that Defendants' liability for breach of the non-compete clause flows from agency and alter ego principles.

breaching Paragraph 3.2(a) because Paragraph 3.2(c) provides in relevant part that there shall be no breach of Paragraph 3.2(a) or 3.2(b) if:

> (i) the activity of [HMR/API [11]] which would cause such breach in the absence of this provision is not the primary business of [HMR/API]; (ii) prior to the closing of such acquisition said party commits in writing to the other party [to this agreement], on terms acceptable to such other party (not to be unreasonably withheld or delayed), to promptly divest itself of the offending assets and/or activity and (iii) such party diligently and reasonably pursues such divestiture and, in the event such divestiture is not completed within twelve (12) months after the date of such acquisition, [HMR/API] thereupon ceases all such activity.

Gaut Decl. Vol. II Ex. 51 at 1287. Defendants argue only that they had until December 16, 2000, which is one year after RPSA purchased Hoechst, to cure any breach of Paragraph 3.2(a). They neither argue nor present evidence that they satisfy parts (i) and (ii) of Paragraph 3.2(c). By its own terms, then, Paragraph 3.2(c) does not preclude summary judgment finding them liable under Paragraph 3.2(a) because Paragraph 3.2(c) reads in the conjunctive; all three of its subsections must be satisfied.

Plaintiff seeks summary adjudication that Defendants' Sixth Affirmative Defense, laches, is no defense to liability for breach of the License Agreement. Again, rather than opposing on the merits, Defendants merely assert that though "the facts Watson sets forth regarding this defense may indeed suggest that Watson was diligent in asserting its claim," Defendants will nevertheless argue at the remedial stage that Plaintiff is not entitled to an injunction. Thus, Defendants apparently seek to preserve their laches defense only in the event that Plaintiff seeks an injunction, assuming liability is established. Laches is therefore no defense to liability on the contracts. That would not preclude the Court from evaluating laches as a defense to equitable relief if and when those issues are presented.

Defendants assert that their Ninth Affirmative Defense, good faith competition, goes only to Plaintiff's Cal. Bus. & Prof. Code § 17200 claim. This defense is therefore unrelated to Plaintiff's breach of contract claims.

Summary adjudication in favor of Plaintiff on the Sixth and Ninth Affirmative Defenses is therefore GRANTED insofar as liability under the License Agreement is concerned.

Therefore, Plaintiff is entitled to summary judgment on the issue of RPPI's liability under Paragraph 3.2(a) of the License Agreement.

## F. RPR Is Liable For Breach Of The License Agreement And Supply Agreement

Plaintiff argues in its Motion that not only are RPPI and RPRPI liable as signatories of the agreements at issue, but their parent company, RPR, is also liable. Defendants failed to oppose this argument by coming forward with "specific facts showing that there is a genuine issue for trial," *see Transco, supra,* or *any* admissible evidence in opposition to RPR's liability. Accordingly, and also because Plaintiff otherwise appears entitled to summary adjudication on this issue, the Court GRANTS Plaintiff's Motion in this regard

---

**11.** In the actual contract, the deleted language refers to any other entity acquired by Watson or RPPI. The provision at issue here, Paragraph 3.2(a) only restricted activities of RPPI or its "Affiliates."

and finds that RPR is liable for breach of both the License Agreement and Supply Agreement.

### III. Cal. Bus. & Prof.Code § 17200

#### A. Liability (Plaintiff's Motion and Defendants' Fourth Motion)

The parties vigorously dispute the application of Cal. Bus. & Prof.Code § 17200 (hereinafter " § 17200") to this dispute. Both parties move for summary judgment on this issue. Largely because divergent ultimate inferences may reasonably be drawn from the undisputed facts, the Court concludes that neither party is entitled to complete summary judgment and, therefore, the § 17200 claim may not be fully resolved on these cross motions. *See Braxton–Secret*, 769 F.2d at 531.

#### 1. "Unfair" Business Act or Practice Prong

In its Order Denying In Part and Granting In Part Defendants' Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6) filed on October 21, 1999, the Court ruled as follows:

> Section 17200 of the California Business & Professions Code prohibits "any unlawful, unfair or fraudulent business act or practice." *Cel–Tech Communications Inc. v. Los Angeles Cellular Telephone Company*, 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). Therefore, the unfair competition law "establishes three varieties of unfair competition—acts or practices that are unlawful, or unfair, or fraudulent." *Id.*

Whether a business act or practice constitutes unfair competition within Section 17200 is a question of fact. *Payne v. United California Bank*, 23 Cal. App.3d 850, 856, 100 Cal.Rptr. 672 (1972).

Plaintiff asserts that it has stated a claim pursuant to California Business & Professions Code § 17200 by sufficiently alleging that Defendants' actions were "unfair." Plaintiff does not assert that any of Defendants' actions were "unlawful" or "fraudulent." "Unfair" conduct under Section 17200 means "conduct that threatens an incipient violation of an anti-trust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." [*Cel–Tech.* 20 Cal.4th] at 187, 83 Cal.Rptr.2d 548, 973 P.2d 527.

Plaintiff has sufficiently alleged facts to establish that Defendants' actions "otherwise significantly threaten[ ] or harm[ ] competition": 1) Plaintiff has the exclusive rights to "market, advertise, promote, distribute, and sell" the Dilacor Products (containing diltiazem) throughout most of the world, Complaint ¶ 6; 2) Defendants agreed to manufacture and supply the Dilacor products to Plaintiff, Complaint ¶ 11; 3) Defendants breached this obligation [12] and stopped manufacturing and supplying the Dilacor Products to Plaintiff, Complaint ¶ 11; 4) At the same time, Defendants were negotiating a merger with HMR, Complaint ¶ 9; 5) the Dilacor Products com-

---

**12.** Defendants assert that "section 17200 is not applicable to redress conduct amounting to nothing more than an alleged breach of contract." Motion at 2:11–12. However, a breach of contract may in fact form the predicate for Section 17200 claims, provided it also constitutes conduct that is "unlawful, or unfair, or fraudulent." *See Allied Grape Growers v. Bronco Wine Company*, 203 Cal. App.3d 432, 249 Cal.Rptr. 872 (1988) (buyers' breach of contract to purchase grapes constituted unfair business practice under Section 17200). Defendants do not refute this case in their Reply. [This was footnote 3 in the October 21, 1999 Order.]

pete with a product of HMR's product containing diltiazem. Complaint ¶ 10; and 6) Defendants' actions benefitted Defendants and HMR by effectively eliminating competition against HMR's diltiazem product, Complaint ¶ 22. Accepting Plaintiff's alleged facts as true, Plaintiff has properly alleged a cause of action for unfair competition pursuant to California Business & Professions Code § 17200.

See October 21, 1999 Order at 7–9.

Thus, the Court has already ruled that the § 17200 claim could proceed beyond the pleading stage. Now the question is whether this claim must go to trial.

Defendants contend that, as to the "unfair" prong of § 17200. Plaintiff cannot show that Defendants "significantly threatened or harmed competition." They argue that at most Plaintiff can merely show harm to itself, caused by a competitor, rather than harm to competition. The brunt of Defendants' argument therefore addresses the sixth, and last, of Watson's allegations described in the Court's October 21, 1999 Order: Defendants' actions benefitted Defendants and HMR by effectively eliminating competition against HMR's diltiazem product.

 When a party sues an ostensible competitor under the "unfair" prong of § 17200, the claim may be proven only on the basis of "conduct that threatens an incipient violation of an anti-trust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, *or otherwise significantly threatens or harms competition.*" *Cel–Tech,* 20 Cal.4th at 187, 83 Cal.Rptr.2d 548, 973 P.2d 527 (emphasis

added). Nothing in this test requires actual harm to competition or consumers. Nevertheless, Defendants essentially argue that the elimination of Plaintiff from the diltiazem drug market did not injure competition or consumers because: (1) the market output has not declined, (2) prices have not risen above competitive levels for the branded versions of the drugs, (3) sales of lower priced generics have risen at the expense of Cardizem CD® and (4) Plaintiff's theory that Defendants' breach of the non-compete and supply provisions gave Defendants enhanced opportunities to sell Cardizem CD® is "belied" by the fact that sales of Cardizem CD® have been in "free fall." Under the *Cel–Tech* test, Defendants argue, Plaintiff's claim cannot be proven. Plaintiff claims that it need not satisfy the *Cel–Tech* test, but even if it does, the test has been met.[13]

Defendants rely on three Ninth Circuit cases arising under the federal antitrust laws that they contend apply to this § 17200 claim. *See Rebel Oil Company, Inc. v. Atlantic Richfield Company,* 51 F.3d 1421 (9th Cir.1995); *Adaptive Power Solutions, LLC v. Hughes Missile Systems Co.,* 141 F.3d 947 (9th Cir.1998); *Austin v. McNamara,* 979 F.2d 728 (9th Cir.1992). The key case, *Rebel Oil,* involved an alleged predatory pricing scheme directed at monopolizing the retail gasoline market in Las Vegas and giving rise to three antitrust claims. The Ninth Circuit affirmed summary judgment for the defendant on the attempted monopolization claim because the plaintiffs could not establish that the defendant had sufficient market power. 51 F.3d at 1443. In reaching that result, the court noted that:

---

**13.** Plaintiff is correct that the *Cel–Tech* test was expressly limited to actions between competitors. *See* 20 Cal.4th at 187 n. 12, 83 Cal.Rptr.2d 548, 973 P.2d 527. Given that HMR was a competitor of Watson before

Hoechst's merger with RPSA, and that the RPR parties effectively stepped into HMR's shoes — *i.e.,* became competitors of Watson — the Court finds that the *Cel–Tech* test is applicable here.

Of course, conduct that eliminates rivals reduces competition. But reduction of competition does not invoke the Sherman Act until it harms consumer welfare.... Accordingly, an act is deemed *anticompetitive* under the Sherman Act only when it harms both allocative efficiency *and* raises the prices of goods above competitive levels or diminishes their quality.

*Id.* at 1433.

These federal antitrust decisions provide sound and appropriate standards for evaluating Watsons's § 17200 "unfair" business act claim. " '[U]nfair methods of competition' under section 5 of the Federal Trade Commission Act covers business practices 'which conflict with the basic policies of the Sherman and Clayton Acts ...' " *Sun Microsystems, Inc. v. Microsoft Corp.*, 87 F.Supp.2d 992, 1000 (N.D.Cal.2000) (*quoting F.T.C. v. Brown Shoe Co.*, 384 U.S. 316, 86 S.Ct. 1501, 1504, 16 L.Ed.2d 587 (1966)); *see also Carter v. Variflex, Inc.*, 101 F.Supp.2d 1261, 1270 (C.D.Cal.2000) (dismissing § 17200 unfair competition claim that evidence failed to support under Sherman Act standard).

To establish the required impact on competition, Plaintiff relies on the Cockburn Declaration. Does his declaration provide a sufficient basis to find harm or threatened harm to competition?

The court in *Rebel Oil* explained that a conclusory expert declaration is *not* sufficient to defeat summary judgment in an antitrust case:

> [W]e note that expert opinion is admissible and may defeat summary judgment if it appears that the affiant is competent to give an expert opinion and that the factual basis for the opinion is stated in the affidavit, even though the underlying factual details and reasoning upon which the opinion is based are not.... [T]he inference to be drawn from expert affidavits must ... be sufficient to support a favorable jury verdict. In the context of antitrust law, if there are undisputed facts about the structure of the market that render the inference economically unreasonable, the expert opinion is insufficient to support a jury verdict.

*Id.* at 1435–36.

Here, the Court finds that Cockburn's declaration fails to meet that test. First, it is utterly conclusory in finding injury to competition. Second, to the extent the declaration incorporates his report, nothing in that study demonstrates either that the supply of diltiazem was reduced or that the prices charged were raised above competitive levels as a result of Watson's ouster from the marketplace. Indeed, as Defendants' counsel pointed out at the hearing on these motions, Cockburn assumed that "the breach of the Supply Agreement has not impacted and will not impact the overall size of the market.... [and] that to the extent Watson has lost unit sales, these have been and will continue to be captured by other diltiazem products such as Cardizem CD." Cockburn Decl. Ex. A at 18. Similarly, Cockburn found that price increases in the branded market were continuing to follow historical trends and in the generic market prices were falling. *Id.* at 30–31. In addition, Cockburn found, at least two new competitors have entered the generic market. *Id.* at 21 n. 13.

As stated in *Sun Microsystems, supra,* "[Watson's] evidence merely indicates harm to its commercial interests, rather than harm to competition." 87 F.Supp.2d at 1001. For these reasons, the Court as factfinder on claims under § 17200 could not reasonably find that Plaintiff has established that Defendants engaged in "unfair" conduct under the *Cel–Tech* test.

### 2. "Unlawful" Business Act or Practice Prong

 No party is entitled to summary judgment in its favor on Watson's § 17200 claim to the extent it is premised on "unlawful" conduct. Though not extensively briefed or argued, Defendants question whether the regulatory violations at Centeon are the type of "unlawful" conduct prohibited by § 17200. The Court notes that the FDA concluded in its August 13, 1998 letter concerning the shutdown that Centeon "has violated the law." *See* Corrected Quinn Decl. Vol. III Ex. 65 at 1325. Section 17200 broadly proscribes unlawful business practices:

> The "unlawful" practices prohibited by section 17200 are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, *regulatory,* or court-made. (*People v. McKale* (1979) 25 Cal.3d 626, 632, 159 Cal.Rptr. 811, 602 P.2d 731.) It is not necessary that the predicate law provide for private civil enforcement.

*Saunders v. Superior Court,* 27 Cal. App.4th 832, 33 Cal.Rptr.2d 438, 441 (1994) (emphasis added). Centeon's violation of FDA regulations falls squarely within this broad proscription. Hence, Defendants are not entitled to have this claim thrown out as a matter of law.

On the other hand, Watson's key factual contention, that Defendants themselves are liable for the "unlawful" regulatory violations that led to the shutdown of the separate entity Centeon, is disputed. Whether Defendants are liable on an agen-cy theory for the "unlawful" regulatory violations that resulted in the shutdown of Centeon is not clear from the current record. The Toll Manufacturing Agreement between Centeon and RPR does appear to confer on RPR the authority to assure FDA compliance at Centeon. *See* Gaut Decl. Vol. II Ex. 58 at 1385 ("Centeon will cooperate with RPR in taking reasonable actions to comply with the FDA Standards . . ."). But Defendants dispute RPR's ability to control activity at Centeon. Therefore, whether those contractual rights, or any other factors, are sufficient to establish agency is not clear from the current factual record. Summary judgment for either side on the "unlawful" prong would be inappropriate.

### 3. "Fraudulent" Business Act or Practice Prong

Plaintiff argues that Defendants are liable under the "fraudulent" prong because they consciously misled Plaintiff. Plaintiff relies on (1) the undisputed fact that Defendants redacted the FDA report on the Centeon shutdown [14] and (2) the disputed fact that Defendants misled Plaintiff to believe that they were working to resume supplying Plaintiff with Dilacor XR®, with no real intention of doing so. The Court could not find as a matter of law that the slight amount of evidence that is undisputed was "likely to deceive" Watson, even assuming Watson was a "reasonable consumer" entitled to the protection of § 17200. *See South Bay Chevrolet v. General Motors Acceptance Corp.,* 72 Cal.

---

**14.** "RPR supplied Watson with only five out of thirty-four pages of the FDA 483 issued to Centeon on July 10, 1998, and even those pages were redacted so that Watson could not tell how serious the problems at Centeon were. The July 10, 1998 Form 483 contained 102 'observations', many of which had numerous subparts." Watson's UF ¶ 146. Defendants claim that the redacted version fully "set forth the observations related to Dilacor XR®" and, in any event, the complete document was publicly available from the FDA. RPR's SGI ¶ 146. Moreover, argues RPR, it sent the complete and unredacted version of the FDA 483 observations to Watson's general counsel on September 14, 1998, Supp. Stone Decl. Ex. 2.

App.4th 861, 85 Cal.Rptr.2d 301, 310 (1999) (*citing Bank of the West v. Superior Court,* 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 546, 833 P.2d 545 (1992)).

■ But Watson is not entitled to the protection of this prong of § 17200 because it is not a member of the public or a consumer entitled to such protection. The Court has identified no case under the "fraudulent" prong of § 17200 allowing one competitor to proceed against another on the basis that the defendant deceived him. Though many courts have described the scope of business activities prohibited by § 17200 in sweeping terms, there is no case authority that "fraudulent" business acts are separately actionable by business competitors absent a showing that the public, rather than merely the plaintiff, is likely to be deceived. This "prong" of § 17200 is comparable to the "unfair" prong at issue in *Cel–Tech, supra;* just as it is necessary under the "unfair" prong to show harm not merely to the plaintiff-competitor but also to competition, so, too, should it be necessary under the "fraudulent" prong to show deception to some members of the public, or harm to the public interest, and not merely to the direct competitor or other non-consumer party to a contract.

For all the foregoing reasons, the Court DENIES Plaintiff's Motion to the extent it seeks summary adjudication of liability under § 17200 and GRANTS Defendants' Fourth Motion for Partial Summary Adjudication concerning § 17200 liability under the "unfair" and "fraudulent" prongs.

## B. Is "Disgorgement" An Available Remedy (Defendants' First Motion)

■ Defendants' First Motion for Partial Summary Adjudication seeks a ruling that Plaintiff may not recover "disgorgement" of Defendants' Cardizem CD® profits as a remedy for any § 17200 violation proved at trial because such a monetary award would be more akin to damages, which are not recoverable under § 17203, rather than restitution, which Plaintiff may recover under § 17203 (in addition to injunctive relief).[15] Cal. Bus. & Prof.Code § 17203 provides in relevant part that:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined .... The court may make such orders or judgments ... as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

The breadth of the term "restore" is what is really at issue on this motion. No case addresses the precise question presented here: When, in violation of § 17200, one competitor reaps a benefit at the expense of, but not from, another competitor, can the victim competitor recover the economic value of that benefit? Put

---

**15.** In its opposition to this motion Plaintiff claims to be entitled to disgorgement in any event, as a remedy for Defendants' breaches of the Supply Agreement and/or License Agreement. This issue is beyond the scope of Defendants' motion, which only seeks to eliminate disgorgement as a possible remedy for the § 17200 claim. Accordingly, the Court declines to express any view on what remedies are available to Plaintiff on its breach of contract claims. At the hearing, Defendants' counsel requested an opportunity to submit new and additional briefs demonstrating that Plaintiff cannot recover for "unjust enrichment" nor recover disgorgement as a remedy for any other breach. Before any such permission will be granted, the parties must meet and confer and set forth their respective positions as to such recovery. If Plaintiff winds up claiming in good faith a basis for such recovery which Defendants in good faith reject, then Defendants can file a carefully targeted motion in limine to preclude such effort.

another way, when the victim was never in possession of the wrongdoer's "benefits" and never had a property interest in those "benefits" [16] does the remedy of restitution under § 17200 authorize transferring that property to the victim?

What *is* clear is that (1) compensatory damages are not available to Plaintiff under § 17203, *see Little Oil Co. v. Atlantic Richfield Co.*, 852 F.2d 441, 445 (9th Cir. 1988), (2) under § 17203 money or property obtained through an unfair business practice in violation of § 17200 may be "restored" to "persons who had an ownership interest in the property or those claiming through that person", *Kraus v. Trinity Management Services, Inc.*, 23 Cal.4th 116, 96 Cal.Rptr.2d 485, 492, 999 P.2d 718 (2000), and (3) restitution pursuant to § 17200 "is not limited only to the return of money or property that was once in the possession of [the person to whom it is returned]", *see Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 178, 96 Cal.Rptr.2d 518, 999 P.2d 706 (2000).

Watson makes a valiant effort to seize on the foregoing language in *Cortez*, but the Court is not persuaded. In *Cortez*, when the Supreme Court of California, quoting from another case, stated that "[c]arned but unpaid salary or wages are vested property rights, claims for which may not be properly characterized as actions for monetary damages", *id.*, it was referring to a right that became immediately identifiable and quantifiable upon the execution and performance of the parties' contract (an employment contract). The employee-plaintiff had worked but did not

get paid. By his work he had conferred an affirmative benefit that was concrete and there was no other way to make him whole but to require payment. In contrast, Watson does not need disgorgement of RPR's profits under § 17203 to be compensated for its loss; the range of standard remedies available for the breaches of the Supply Agreement and License Agreement can accomplish that.

What Plaintiff really seeks is recovery under an "unjust enrichment" theory. The *Cortez* court specifically declined to consider whether an order under § 17203 "might be proper ... on a disgorgement of benefit theory." 23 Cal.4th at 176, 96 Cal. Rptr.2d 518, 999 P.2d 706. There is a difference between "getting" and "getting back." The abstract property rights that Watson invokes do not entitle it to get something it never had.

While § 17200 serves important and vital public policies and interests by permitting injured plaintiffs to benefit from restitutionary remedies, for this Court to permit Watson to recover "disgorgement" of all the revenues, or even merely the extra profits, that the RPR entities derived from sales of Cardizem CD® would extend the scope of § 17203. That the Court will not do. Accordingly, the Court GRANTS Defendants' First Motion for Partial Summary Adjudication.

## IV. Post–Contract Damages (Defendants' Second Motion)

 Defendants' Second Motion for Partial Summary Adjudication seeks to bar Plaintiff from recovering damages for

---

**16.** Plaintiff argues that the non-compete provision in the License Agreement did confer a "property interest" in the profits reaped by Defendants on sales of Cardizem CD®. The Court is not persuaded by that argument. The simple fact is that Cardizem CD® would have been available notwithstanding any violation of the non-compete clause. Though the non-compete clause makes it wrongful for any RPR entity to share in those profits, Plaintiff could not complain if there had been no merger and HMR had continued to profit from Cardizem CD®.

lost profits on generic diltiazem *after* June 30, 2000, when RPRPI's obligation to supply Plaintiff with its requirements of that product expired.[17] Plaintiff objects to this motion on procedural grounds in that it seeks only to narrow the issues on one part of a damages claim. Though there is a split of authority on this issue, the Court considers this motion to be proper. *Compare In re U.S. Grant Hotel Assoc. Ltd. Sec. Lit.,* 1990 WL 260536, at *2 (S.D.Cal. Nov.6, 1990) (concluding that motion for partial summary judgment to resolve only seven factual issues is procedurally improper); *with Ajir v. Exxon Corporation,* 1995 WL 261411, at *4 (N.D.Cal. May 2, 1995) (concluding that a motion for partial summary judgment may properly be directed to only part of a claim). Accordingly, the Court shall proceed to consider this motion on its merits.

▇▇▇ Plaintiff claims that it was forced to allocate the limited supply of Dilacor XR® to the more profitable branded product. It contends that Defendants' breach of the Supply Agreement permanently drove Plaintiff out of the generic diltiazem market by May 1999 — well within the June 30, 2000 contract period of the Supply Agreement. *See* Watson's SGI in Opp. to RPR's Second Mot. ¶¶ 52–53. Plaintiff

essentially argues that had it not already been driven permanently out of the generic diltiazem market, it would have accorded a higher priority to finding a substitute manufacturer or obtaining FDA approval to manufacture the drug at its Corona manufacturing site, in order to meet its supply needs for generic diltiazem after termination of the Supply Agreement on June 30, 2000. Wilkinson Decl. ¶¶ 18–22. Moreover, Plaintiff asserts that it could have obtained FDA approval to manufacture generic diltiazem at its own facility had it not (1) already been permanently forced out of that market and (2) subsequently made a business decision, prior to June 30, 2000, not to devote resources to reentry into the generic diltiazem market. Hsia Decl. ¶¶ 3–12; Ex. 1.[18]

As Defendants characterize it, the question is whether Defendants "proximately caused" post-contract lost profits that Plaintiff can prove to a "reasonable certainty." *See Sanchez–Corea v. Bank of America,* 38 Cal.3d 892, 907, 215 Cal.Rptr. 679, 701 P.2d 826 (1985) (plaintiff must show lost profits with reasonable certainty as to both occurrence and extent). Defendants' argument is premised on the "key" facts that before June 30, 2000 Plaintiff neither obtained the requisite FDA ap-

---

**17.** Apparently for purposes of this motion only, Defendants ask the Court to assume that Plaintiff properly exercised an option to extend the Supply Agreement for an additional year to June 30, 2000.

**18.** Defendants object to Hsia's declaration on several grounds including that it is impermissible opinion testimony and contains hearsay. The Court overrules those objections. First, Hsia testified on the basis of his own personal knowledge and extensive experience in Plaintiff's dealings with the FDA and his opinion is therefore helpful. *See* Fed.R.Evid. 701 Advisory Committee's Note to 2000 Amendments: "For example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business,

without the necessity of qualifying the witness as an ... expert.... Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business." Hsia's testimony is akin to that described in the Advisory Committee's Notes. Second, although the statement of FDA inspector Pacio that he would recommend approval lacks evidentiary significance given that approval was not in fact granted, the other factors Hsia mentions at ¶¶ 3–12 provide sufficient support (at this stage) for a jury to find that Watson was not in fact incapable of obtaining approval.

proval to make generic diltiazem at its own facility nor contracted with a third party to provide it with generic diltiazem. *See* Watson's SGI in Opp. to RPR's Second Mot. ¶ 6.

The Court cannot conclude as a matter of law that Plaintiff's lost profits from inability to sell generic diltiazem after June 30, 2000 either are not "reasonably certain" or clearly were not "proximately caused" by Defendants' breach of the Supply Agreement. Plaintiff's evidence is exceedingly thin, but if a jury believed its witnesses, it could reasonably conclude that on the basis of economic realities and business decisions — described as "sound" by Plaintiff's management — Plaintiff recognized that it had been "forced" out of the generic diltiazem market prior to termination of the Supply Agreement and it would have been futile for it to pursue an alternate supply of generic diltiazem supply long before June 30, 2000. If so, the "key" facts that Plaintiff did not in fact obtain the requisite FDA approval to make generic diltiazem at the Corona facility (which approval it had apparently quit seeking in 1999) or contract with a third party to provide it with generic diltiazem before June 30, 2000 are not dispositive.

Nevertheless, Plaintiff apparently *chose* not to secure an alternate source of generic diltiazem before June 30, 2000. That Plaintiff made that choice will subject it to a very difficult burden to prove at trial that it *could* have secured an alternate source of generic diltiazem before June 30, 2000 or could have stockpiled a reasonable amount of that drug from what Defendants were obligated to supply such that it would have earned profits for a finite period after June 30, 2000. Plaintiff's theories appear somewhat contrived, and the Court can envision a course of cross-examination that would undermine Watson's witnesses. But on the current record, Defendants' Second Motion for Partial Summary Adjudication must be DENIED.

## CONCLUSION

For all the foregoing reasons, and good cause appearing therefor, the Court GRANTS Plaintiff's Motion in part, GRANTS in part Defendants' First and Fourth Motions for Partial Summary Adjudication and DENIES Defendants' Second and Third Motions for Partial Summary Adjudication as follows:

1. The Court finds that RPRPI breached the Supply Agreement. Defendants may not rely on their Third, Fifth or Eighth Affirmative Defense to defend against this claim.

2. Article VIII of the Supply Agreement is no defense to Plaintiff's claims. Accordingly, Defendants' Third Motion for Partial Summary Adjudication concerning Article VIII is DENIED.

3. The Court finds that RPPI breached the License Agreement. Defendants may not rely on Paragraph 3.2(c), their Sixth or their Ninth Affirmative Defense to defend against this claim.

4. RPR is liable for the breaches of both the Supply Agreement and License Agreement.

5. On the cross motions for summary adjudication of § 17200 liability, Plaintiff's Motion is DENIED and Defendants' Fourth Motion for Partial Summary Adjudication is GRANTED in part and DENIED in part.

6. Defendants' First Motion for Partial Summary Adjudication on Plaintiff's "disgorgement" claim under § 17200 is GRANTED.

7. Defendants' Second Motion for Partial Summary Adjudication on post-contract damages is DENIED.

IT IS SO ORDERED.